## UNITED STATES v. A. SCHRADER'S SON, Inc.

(District Court, N. D. Ohio, E. D.    September 24, 1919.)

### No. 4037.

I. **Monopolies** ⊂⊃12(2)—**Prohibitions against restraint of trade apply to patented and unpatented articles.**

Articles of commerce, although covered by valid patents, when manufactured, sold, and placed in the ordinary channels of trade, become subject to the same limitations and stand on the same footing as unpatented articles, and whatever would be an illegal combination in restraint of trade in the case of unpatented articles will be equally so if the articles are patented.

2. **Patents** ⊂⊃206—**Contracts held sales and not licenses.**

Transactions by which the manufacturer delivers patented articles under a so-called license agreement, receiving full payment, except a small part of the price denominated a "royalty," to be paid when the articles are resold, with reserved right to retake the articles on violation of the contract and repayment of the sum paid therefor, *held* not licenses, but sales, which vest title in the purchasers.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Monopolies ⊜⟶17(1)—Contract to sell at fixed price held not a "contract, combination, or conspiracy in restraint of trade."**

A method of doing business by which a manufacturer sells its product to jobbers under written agreements that they shall resell to retailers and consumers only at prices fixed by the manufacturer, but which contain no restrictions upon the prices at which retailers may sell to consumers, held not to involve a "contract, combination, or conspiracy in restraint of trade," within Sherman Anti-Trust Act, § 1 (Comp. St. § 8820).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

Criminal prosecution by the United States against A. Schrader's Son, Incorporated. On demurrer to indictment. Sustained.

Judgment reversed 252 U. S. 85, 40 Sup. Ct. 251, 64 L. Ed. ——.

W. S. Mitchell, Asst. Atty. Gen., and E. S. Wertz, U. S. Atty., of Cleveland, Ohio, for the United States.

Chas. S. Wachner, of Cleveland, Ohio, and Eugene V. Myers, of New York City, and H. H. McKeehan, of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge. The substantive allegations of this indictment are that defendant is engaged in manufacturing valves, valve parts, pneumatic pressure gauges, and various other accessories; that it sells and ships large quantities of such articles to tire manufacturers and jobbers in the Northern district of Ohio and throughout the United States; that these tire manufacturers and jobbers resell and reship large quantities of these products to (a) jobbers and vehicle manufacturers, (b) retail dealers, and (c) to the public, both within and without the respective states into which the products are shipped; that these acts have been committed within three years next preceding the presentation of this indictment and within this district; that the defendant executed, and caused all the said tire manufacturers and jobbers to whom it sold its said products to execute with it, uniform contracts concerning resales of such products; that every manufacturer and jobber was informed by the defendant and well knew when executing such contracts that identical contracts were being executed and adhered to by the other manufacturers and jobbers; that these contracts thus executed purported to contain a grant of a license from the defendant to resell its said products at prices fixed by it to (a) jobbers and vehicle manufacturers similarly licensed, (b) retail dealers, and (c) the consuming public; that all these contracts provided that the products thus sold to tire manufacturers and jobbers provided that they should not resell such products at prices other than those fixed by the defendant. Copies of these contracts are identified by exhibit numbers and attached to the indictment. It is further charged that the defendant furnished to the tire manufacturers and jobbers who entered into such contracts lists of uniform prices, such as are shown in said exhibits, which the defendant fixed for the resale of its said products to (a) jobbers and vehicle manufacturers, (b) retail dealers, and (c) the consuming public, respectively; and that the defendant uniformly refused to sell and ship its products to tire manufacturers and jobbers

who did not enter into such contracts and adhere to the uniform resale prices fixed and listed by the defendant; further, that tire manufacturers and jobbers in the Northern district of Ohio and throughout the United States uniformly resold defendant's products at uniform prices fixed by defendant, and uniformly refused to resell such products at lower prices, whereby competition was suppressed and the prices of such products to retail dealers and the consuming public were maintained and enhanced.

Such, as I understand them, are all of the substantive allegations of the indictment. The remaining paragraphs state merely the pleader's conclusions of law from these facts and do not aid any defective or insufficient allegations of fact. Thus it will be observed that the contract, combination, or conspiracy charged comes merely to this: That the defendant has agreed, combined, or conspired with tire manufacturers and with jobbers, by selling or agreeing to sell valves, valve parts, pneumatic pressure gauges, and various accessories, with the further understanding or agreement that in making resales thereof they will sell only at certain fixed prices. It will be further observed that the retailers, to whom the jobbers in ordinary course of trade would naturally sell rather than to the consuming public, and who in turn sell and distribute these articles to and among the ultimate consumers, are not included within the alleged combination or conspiracy. True, if a tire manufacturer or licensed jobber makes a sale to a consumer, it is charged he has agreed to sell only at the listed prices, but so far as retailers themselves are concerned they may sell or give away the articles thus bought without violating any agreement, understanding or condition of the alleged combination or conspiracy in restraint of trade.

[1] The defendant urged upon me at the former hearing and at this hearing that defendant had a right to fix and control the prices at which its product might be resold not only by tire manufacturers and licensed jobbers but also by retailers, for the reason that the exhibits annexed to the indictment are license agreements only, reserving title to the defendant, and exacting a royalty to be paid only when the final sale to the retailer or consumer had been made. In my opinion this question does not properly arise under the allegations of this indictment, for the reason that the provisions of these exhibits cannot be substituted for or add to the substantive allegations of the indictment. Be that however, as it may, I am clearly of the opinion that the fact that articles of commerce said to be the subject-matter of an illegal combination in restraint of trade are covered by letters patent of the United States does not require any conclusion different from what would be required if they were not covered by patents. This conclusion is deduced from a careful study made on the former hearing of this demurrer of the many decisions of the Supreme Court of the United States cited by counsel, chiefly the following: Bement v. Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; Dr. Miles Medical Co. v. Park, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880; Bauer v. O'Donnell, 229 U. S. 1, 33 Sup. Ct. 616, 57

L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Straus v. Victor Talking Machine Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955; Motion Picture Co. v. Universal Film Co., 243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; Boston Store v. American Graphophone Co., 246 U. S. 8, 38 Sup. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447. The net result, as I understand it, of the holding of these several cases, is that the doctrine of the Button Fastener Case, 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728, is overruled and that articles of commerce, notwithstanding they are covered by valid patents become when manufactured, sold, and placed in the ordinary channels of trade, subject to the same limitations and stand on the same footing as ordinary unpatented articles of commerce; and whatever would be an illegal combination in restraint of trade having for its subject-matter unpatented articles will be an illegal combination if the articles are patented.

[2] The so-called license agreements, exhibited with the indictment, are in my opinion both in substance and effect only selling agreements. The title to the valves, valve parts, pneumatic pressure gauges and other automobile accessories, passed to the so-called licensees and licensed jobbers. The privilege reserved in three of them to substitute at the so-called licensor's discretion, new stock for stock in possession of tire manufacturers and licensed jobbers, and the provision in all of them that upon termination for default or violation the licensor may reclaim all undisposed of stock, paying therefor the invoice price, does not change the transaction into a conditional sales agreement, or reduce the title of the tire manufacturers or licensed jobbers to a mere license to use in the meantime a patented article. The privileges thus reserved are more in the nature of a right to repurchase than in the nature of a license to use or a conditional sale. The fact that a certain relatively small part of the price is to be paid only when the tire manufacturer has used these parts in making tires, or when they have been sold to some other licensed jobber or to dealers and consumers, and that this deferred payment is denominated a royalty, does not modify or control the legal force and effect of the transaction. This is merely a deferred payment of part of the sale price, and to this extent credit is extended to the tire manufacturer and the licensed jobber. All the rights, risks, burdens, and privileges of ownership are with and are borne by the so-called licensees. The use of the word "royalty" cannot be regarded otherwise than a subterfuge, intended only to give color to defendant's theory that articles of commerce covered by a patent, although sold and distributed through channels of trade in the customary way, may still be kept under the patent monopoly, if the patentee has not as yet received the purchase price in full. This theory, in my opinion, is not tenable, and that the authorities above cited are conclusive to the contrary. For both reasons, namely, that the provisions of these exhibits cannot add to the substantive allegations of the indictment, and, even if considered, do not call for any different conclusion, the proposition advanced and relied upon by defendant is, in my opinion, not sound.

This brings us to the proposition relied on by the government and strenuously controverted by defendant. Do or do not the substantive allegations of the indictment as above summarized state a contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states? And the answer to this question depends on whether or not section 1 of the Sherman Anti-Trust Law (Comp. St. § 8820) is to be so construed as to bring within its provision a method of doing business such as is disclosed by the indictment. The government asserts that agreements between a manufacturer and jobbers for the sale to them of the manufacturer's own product on condition or with the understanding on their part that they will resell that product only at certain prices fixed or listed by the manufacturer is per se a contract or combination or conspiracy in restraint of trade in violation of the provisions of the Sherman Anti-Trust Act (Comp. St. §§ 8820-8823, 8827-8830). It is further asserted that this is true, regardless of whether or not the prices thus fixed are reasonable, whether or not the arrangement is one made only to prevent ruinous competition tending to paralyze production, and whether or not, except as is implied by the agreements themselves, any monopolization or unreasonable restraint of interstate trade is thereby produced; in other words, a case is stated and is proved, merely by proving an agreement between the manufacturer and jobbers who resell and distribute his product whereby the latter agreed to sell at prices fixed by the former; and it is asserted that section 1 of the Sherman Anti-Trust Law, properly construed, forbids any such arrangement. Manifestly, if this construction is given said section, the crime is committed if the manufacturer makes these agreements with two or more of his jobbers; and if, upon the trial, proof is produced that the defendant has made such contracts with two or more, and with stronger reason when proof is produced that he has made such contracts with all or substantially all of his jobbers, then the court must charge the jury as a proposition of law that the defendant is guilty, and refuse to permit the introduction of testimony to show that monopoly has not resulted, that trade has not been restrained or that the tire manufacturers and jobbers sell little or no part of the product to the consumers.

The cases cited in argument fall within several classes. One class consists of those which deal with agreements by the manufacturer for the resale of his own product. Of this class there are, so far as I know, only two Supreme Court cases and those are Dr. Miles Medical Co. v. Park, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, and U. S. v. Colgate Co., 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, decided June 2, 1919. The holdings of these cases and a comparison of what seems to me to be the conflicting reasoning of them, as well as the diverse result, will not be made until after I have said what I intend to say about the cases of the other classes.

Another class of cases are those in which the manufacturer has undertaken to annex to the sale of a patented article a term or condition that it should be resold by any subsequent purchaser only at a fixed price. Of this class are the following: Bauer v. O'Donnell, 229

U. S. 1, 33 Sup. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Straus v. Victor Talking Machine Co., 243 U. S. 490, 37 Sup. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955; Motion Picture Co. v. Universal Film Co., 243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; and Boston Store v. American Graphophone Co., 246 U. S. 8, 38 Sup. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447. The holding of these cases, as I understand them, is as stated by Mr. Chief Justice White in Boston Store v. American Graphophone Company, in substance as follows: Under the general law the owner of movables cannot sell the movables and lawfully by contract fix a price at which the product should afterwards be sold, because to do so would be at one and the same time to sell and retain, to part with and yet to hold, to project the will of the seller so as to cause it to control the movable parted with, when it was not subject to his will because owned by another, and thus to make the will of the seller unwarrantedly take the place of the law of the land as to such movables. The case of Henry v. Dick exempted from the operation of this rule patented articles. It was held that the United States patent laws conferred upon the patentee a right to impose conditions of this nature, as had been previously held in the Button Fastener Case. This led to the long series of cases above cited, in which the proposition was ultimately established that no difference in this respect exists between patented and unpatented articles, and that the maker, after he has received the full value of his article, including the value given thereto by his patent, stands upon no different footing than the maker and seller of any other article of personal property. In this series of cases the Dr. Miles Co. Case is repeatedly referred to, and it is said that the effort of a manufacturer to impose this limitation was within the prohibition against restraint of trade and monopoly contained in the Sherman Anti-Trust Law. It is a little difficult, logically, to perceive why an invalid stipulation in a contract could become a contract in restraint of trade, although one can readily see why a combination or conspiracy using invalid agreements might result in such a violation. This is noted in passing because of the insistence of counsel for the government that a combination or conspiracy, such as was clearly disclosed in the Colgate Case, might not be in violation of the Sherman Anti-Trust Law, whereas, if that combination and conspiracy had been put in writing in the form of an agreement, it would be a violation, notwithstanding such provisions in the agreement were themselves void. Furthermore, the reference to the Dr. Miles Medical Co. Case and all others bearing on this question were merely incidental; no re-examination of the principles upon which the Dr. Miles Medical Co. Case is based was made and no substantial support is given by them to the Dr. Miles Medical Co. Case.

Another class of cases are those in which two or more persons engaged in making or selling competitive articles of commerce make contracts or enter into combinations or conspiracies for the purpose of controlling or fixing the price at which their competitive articles shall be sold. Of this class are Addyston Pipe & Steel Co. v. United States,

175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Eastern States Retail Lumber Dealers' Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; and Thomsen v. Cayer, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322. The books are full of cases of this class, but these are named because they were cited in argument by counsel for the government. This is the typical and classical case of illegal combination in restraint of trade. Such combinations have from time immemorial, independently of the Sherman Anti-Trust Law or any state trust law, been held to be illegal. They were illegal at common law, and I fancy that the authors of the Sherman Anti-Trust Law had such combinations in mind primarily when they framed it. In this class of cases competition is suppressed, and the theory of the law from time immemorial is and always has been that such combinations were so inherently dangerous in their tendency that no proof was required to show that monopoly resulted or trade was restrained, and no proof could be received to show the contrary. Such was and has been the prevailing economic belief which has found its reflection in this long line of cases. Thus, in the Addyston Pipe & Steel Co. Case, the pipe manufacturers entering into that combination produced only about 30 per cent. of the similar product being produced by all the manufacturers in the United States, yet the illegal combination resulted from the mere fact of the agreement and combination; and such I believe to be the uniform holding in all cases where two or more persons engaged in producing independently competitive articles of commerce make an agreement, combination, or conspiracy whereby the prices of their competing products are fixed or regulated. Manifestly in this situation a different problem was presented from that presented when one manufacturer makes agreements having to do only with the sale and distribution of his own product through the channels of trade.

Another class of cases are those in which one producer or manufacturer has monopolized trade or commerce in a certain line of product. Of this class are U. S. v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, and Standard Oil Co. v. U. S., 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. The books are also full of cases of this class, particularly within recent years. Obviously the doctrine of the Addyston Pipe & Steel Co. Case and a recognition of the rule of law upon which it rests combined to produce the one large corporation having for its object the bringing within its own control either all or such a part of one line of trade or industry as would enable it to dominate the industrial field and fix prices, which all lesser competitors would be obliged to observe and follow. As a means to this end, price cutting became perhaps the most effective weapon of the larger corporation. These cases are controlled by the second section of the Sherman Anti-Trust law. This section makes it a crime for any person to monopolize trade or commerce, whether or not that monopolization is the result of his own individual activities or the result of a combination or conspiracy with another person or other persons. And such, I understand, is the basis for the decision in the Standard Oil Co. and American

Tobacco Co. Cases. It was in these cases that the so-called doctrine of the "rule of reason" was originated and applied. In their essential nature they are more akin to the Dr. Miles Medical Co. Case, the Colgate Co. Case, and the case now before the court than are either of the other classes already cited and briefly reviewed. In determining these cases a wide range of inquiry and testimony is required. The history of the organization of the particular corporation has been inquired into; the effect upon trade and commerce generally as a result of the bringing within one control of previously competing industries and upon trade and commerce in that line of product throughout the United States all become relevant and important. Whether or not monopolization in trade and commerce has resulted depends, not upon the form of corporate organization, nor upon the acquisition of previously existing competing industries, but upon the resulting effect thereby produced upon trade and commerce in the particular articles of commerce. The crime may be committed, even though there is no contract, combination, or conspiracy with any other person; but obviously, for the reason that the facts alleged do not include any which charge monopolization of trade or commerce, the Sherman Law cannot be so construed as to make defendant's conduct a crime under section 2 of the act.

Let us now return to the cases of the class to which the present indictment belongs, namely, Dr. Miles Medical Co. v. Park, supra, and U. S. v. Colgate Co., supra. Defendant urges that there is a manifest inconsistency between the reasoning, if not between the holdings, of these two cases; that if the basic principles announced in the latter case are to be taken in the ordinary sense imported by the language the present case falls within the Colgate Case; and that, properly construed, neither section 1 nor 2 of the Sherman Anti-Trust Law makes the defendant's conduct a crime.

The Dr. Miles Medical Co. Case, standing alone, would seem to require that this demurrer be overruled, and a holding that the Sherman Anti-Trust Law is violated and a crime committed, merely upon a showing of the making by defendant and two or more jobbers of the agreements set up in the indictment, certainly if the jobbers were competitors in the same territory. That case has been frequently cited as establishing this proposition. The question arose upon a demurrer to a bill brought by the Dr. Miles Medical Company to enjoin a violation of alleged contracts with its jobbers and retail dealers, all of whom, it was alleged, had entered into agreements not to resell except at prices fixed by the vendor. The demurrer might well have been sustained on the ground stated under the heading "Second" (220 U. S. 404, 31 Sup. Ct. 383 [55 L. Ed. 502]), namely, that the manufacturer who sells an article and receives its value cannot impose restrictions upon the purchaser's right to alienate it. The bill was therefore seeking to enforce void provisions in the contract, and such I understand to have been the view of the court. However, at page 400 and at page 408 of 220 U. S. (31 Sup. Ct. 381, 382, 384, 385 [55 L. Ed. 502]), it is explicitly stated that these agreements are agreements to fix prices and restrain trade and are therefore invalid both by common law and

under the Sherman Anti-Trust Law. It should be observed, though, that the agreements in question allege that the maker, the jobbers, and all retail dealers handling, selling and dealing in the maker's product had entered into these agreements and had done so for the purpose of fixing and establishing certain prices. In the present case the retailers are not included. Inclusion of them in the Dr. Miles Medical Company Case is much stressed in the opinion. Thus at page 399 of 220 U. S. (31 Sup. Ct. 381, 55 L. Ed. 502), it is said:

"It is, as we have seen, a system of interlocking restrictions by which the complainant seeks to control, not merely the prices at which its agents may sell its products, but the prices for all sales by all dealers at wholesale or retail, whether purchasers or subpurchasers, and thus to fix the amount which the consumer shall pay, eliminating all competition."

Further, on page 400 of 220 U. S., on page 381 of 31 Sup. Ct. (55 L. Ed. 502):

"Next, all competition between retailers is destroyed, for each such retailer can obtain his supply only by signing one of the uniform contracts prepared for retailers, whereby he covenants not to sell to any one who proposes to sell again unless the buyer is authorized in writing by the complainant, and not to sell at less than a standard price named in the agreement. Thus all room for competition between retailers, who supply the public, is made impossible. If these contracts leave any room at any point of the line for the usual play of competition between the dealers in the product marketed by complainant, it is not discoverable."

Let me repeat: The retailers are not in the present case included. They may compete freely with one another, and may even give away the articles purchased by them. No restriction is imposed which prevents them from selling to the consumer at any price, even though it be at a ruinous sacrifice and less than the price made to them by the jobber.

Personally, and with all due respect, permit me to say that I can see no real difference upon the facts between the Dr. Miles Medical Co. Case and the Colgate Co. Case. The only difference is that in the former the arrangement for marketing its product was put in writing, whereas in the latter the wholesale and retail dealers observed the prices fixed by the vendor. This is a distinction without a difference. The tacit acquiescence of the wholesalers and retailers in the prices thus fixed is the equivalent for all practical purposes of an express agreement, and as has already been observed, the mere fact that there were some retailers who did not uniformly acquiesce in and observe the prices thus fixed does not amount to a distinguishing consideration, for a combination or conspiracy in restraint of trade results, if at all, whenever two or more of the wholesalers or retailers thus agree by an express or implied contract to observe certain prices in a competitive territory.

Counsel for the government urged that the two cases are to be distinguished because in the former a contract had been entered into between the maker and the jobbers and retailers, whereas in the latter no such contracts had been entered into, but the maker merely fixed the wholesale and retail prices and procured an express or tacit agreement to observe them by certain methods less formal but none the less

essentially the same. These methods, as summarized in the opinion in the Colgate Case, were distribution among dealers of letters, telegrams, circulars, and lists showing uniform prices to be charged; urging them to adhere to such prices and notices, stating that no sales would be made to those who did not; requests, often complied with, for information concerning dealers who had departed from specified prices; investigation and discovery of those not adhering thereto and placing their names upon "suspended lists"; requests to offending dealers for assurances and promises of future adherence to prices, which were often given; uniform refusals to sell to any who failed to give the same; sales to those who did; similar assurances and promises required of, and given by, other dealers, followed by sales to them; unrestricted sales to dealers with established accounts who had observed specified prices, etc. It seems to me that the method here described, namely, putting a wholesaler or retailer out of business who refuses to observe and keep the list of prices made by the vendor, is of equal force with an express promise voluntarily made as a condition upon which he obtains his supplies.

Section 1 of the Sherman Anti-Trust Act is not limited to contracts in restraint of trade. It includes any combination or conspiracy having for its object a restraint of interstate trade or commerce. Any subterfuge, device, indirect acts, which brings about co-operation to accomplish a predetermined purpose will amount to a conspiracy. In the Colgate Case the predetermined purpose of the maker, known to all the wholesalers and retailers, was to market a product at certain fixed prices. Every wholesale or retail dealer who acquiesced therein or acted in furtherance of the accomplishment of that purpose made himself a member of a conspiracy. It matters little, it seems to me, whether the maker exacted a written agreement to resell at certain fixed prices before selling to a wholesale or retail dealer, or only sells to such wholesale and retail dealers who do in fact, with knowledge of the intent and purpose of the maker, buy and continue to buy and sell at such fixed prices. Granting the fundamental proposition stated in the Colgate Case, that the manufacturer has an undoubted right to specify resale prices and refuse to deal with any one who fails to maintain the same, or, as further stated, the act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent discretion as to parties with whom he will deal, and that he of course may announce in advance the circumstances under which he will refuse to sell, it seems to me that it is a distinction without a difference to say that he may do so by the subterfuges and devices set forth in the opinion and not violate the Sherman Anti-Trust Act, yet if he had done the same thing in the form of a written agreement, adequate only to effectuate the same purpose, he would be guilty of a violation of the law. Manifestly, therefore, the decision in the Dr. Miles Medical Case must rest upon some other ground than the mere fact that there were agreements between the manufacturer and the wholesalers.

That further ground, it seems to me, is pointed out in the Colgate Case and in the quotations heretofore made from the Dr. Miles Medi-

cal Co. Case. There must be a purpose to create and maintain a monopoly, and the acts charged in the indictment must be sufficient to show that there was effective means adopted to create and maintain a monopoly; otherwise the right of the trader or manufacturer to specify resale prices and refuse to deal with any one who fails to maintain the same is of necessity destroyed.

In the Dr. Miles Medical Co. Case the allegations of the bill were interpreted as disclosing a purpose to create or maintain a monopoly, and as describing conduct and acts adequate so to do. The particular allegations emphasized as adequate so to do were the contracts and the system of business imposed upon the retailers, regulating and controlling their relations to the ultimate consumer. This conclusion received some support from section 2 of the Clayton Act (Comp. St. § 8835b), adopted October 15, 1914. It is there made unlawful for any person engaged in interstate commerce or in the course of such commerce either directly or indirectly to discriminate in price between different purchasers of commodities. A proviso follows that nothing in that section contained shall prevent such persons from selecting their own customers in bona fide transactions and not in restraint of trade. The indictment here charges the selection of tire manufacturers and jobbers as the customers of the defendant company. If it has a right to select such customers in bona fide transactions, and is forbidden from either directly or indirectly discriminating in price between them, what harm results if it puts such agreements in writing? The point, however, which I wish to emphasize, is that the allegations of this indictment, not alleging any purpose, or facts from which such a purpose can be inferred, to monopolize interstate trade, within the prohibition and meaning of section 2 of the Sherman Anti-Trust Act and the last clause of section 2 of the Clayton Act, does not charge a crime under section 1 of the Sherman Anti-Trust Act as that act should be construed.

What the indictment charges I have already stated at the beginning of my remarks. I interpret it as charging that defendant has made contracts with all tire manufacturers and jobbers to whom it sells its product to execute uniform contracts, and that these contracts contain provisions requiring that they shall not sell to jobbers and vehicle manufacturers, retail dealers and the consuming public except at certain prices fixed by the defendant. The Sherman Anti-Trust Law, as I construe it, in the absence of other and additional allegations charging an intent and purpose to monopolize trade, does not make the acts thus charged a crime; and this conclusion is the same, despite the fact that defendant contends this product is covered by patents which permit it to control the resale prices in the manner set forth in the agreements exhibited with the indictment.

I am content to dispose of the demurrer in this way. If I am wrong, the important question involved can be reviewed promptly by the government by means of error proceedings direct to the Supreme Court. The question is of such importance that it probably will not be settled satisfactorily to the profession, except by a decision of that tribunal.

If I should adopt the contrary view, the opportunity to have the question thus reviewed will be denied to the parties.

An order may be entered, vacating my order of last term overruling the demurrer, and sustaining the demurrer to the indictment, and exception may be noted.