UNITED STATES v. NATIONAL ASS'N OF WINDOW GLASS MFRS. et al.

(District Court, N. D. Ohio, E. D.   February 2, 1923.)

No. 817.

1. **Monopolies** ⬅13—**Agreement restricting all factories in trade to half-time operation directly restrains interstate commerce.**

An agreement between an association embracing all the skilled window glass blowers and an association of the window glass manufacturers, whereby all of the factories in which window glass is manufactured by hand were divided into two classes, and each class permitted to operate only half of the time, during which the other class must remain idle, must of necessity limit the total production of such glass, and must necessarily and directly restrain interstate commerce therein, notwithstanding testimony that those results did not follow.

2. **Commerce** ⬅16—**Production of articles intended for shipment into another state is not "interstate commerce."**

The manufacture and production of articles is not interstate trade or commerce, even though there may be a present intention to sell and ship them in such trade or commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

3. **Monopolies** ⬅13—**Interference with commerce by agreement closing factories for half time is not incidental.**

An agreement between employers and employees, whereby each of the factories engaged in the production of an article shipped in interstate commerce is required to cease operation for half of the year is one whose effect on interstate commerce is direct, material, and substantial, and not merely indirect or incidental.

4. **Monopolies** ⬅13—**Clayton Act does not justify agreement with labor union closing factories half time.**

Clayton Act, § 6 (Comp. St. § 8835f), providing that the anti-trust laws shall not forbid the existence and operation of labor organizations or restrain members thereof from lawfully carrying out their legitimate objects, does not legalize an agreement between an association of window glass workers and window glass manufacturers, whereby each of the factories producing hand-blown window glass was to remain closed for half of each year, since the restraint or undue interference with interstate trade or commerce is not a legitimate object of a labor organization, nor a lawful means of carrying out its objects.

5. **Monopolies** ⬅13—**Restriction of factories to half-time operation held unreasonable.**

Even if the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) prohibits only unreasonable restraint of interstate trade or commerce, an agreement between an association of window glass workers and an association of manufacturers, whereby each factory was to remain closed for half of each year, as a result of which the workers were required to go from place to place to obtain employment, and the less efficient fac-

tories were kept in operation at the expense of the more efficient and of the consuming public, is not a reasonable restraint of trade.

In Equity. Suit by the United States against the National Association of Window Glass Manufacturers and others, to dissolve and enjoin an agreement and combination in restraint of interstate trade or commerce. Decree rendered for plaintiff.

Roger Shale, Sp. Asst. Atty. Gen., and Gerard J. Pilliod, Asst. U. S. Atty., of Toledo, Ohio, for the United States.

Squire, Sanders & Dempsey, of Cleveland, Ohio, John W. Davis, of New York City, Patterson, Crawford, Miller & Arensburg, of Pittsburgh, Pa., and Stetson, Jennings & Russell, of New York City, for National Ass'n of Window Glass Mfrs.

Calfee, Fogg & White, of Cleveland, Ohio, and I. L. Broadwin, of New York City (Pierre A. White, of Cleveland, Ohio, of counsel), for National Ass'n of Window Glass Workers.

WESTENHAVER, District Judge. This suit is brought, under favor of section 4 of the Sherman Anti-Trust Law (Comp. St. § 8823), to dissolve and enjoin an agreement and combination in restraint of interstate trade or commerce. The manufacturers of hand-blown window glass, said to comprise substantially all engaged in that industry, are charged with having agreed through their wage committee with a workers' organization, said to comprise all laborers in the hand-blown glass industry, upon a wage scale which, in view of the conditions surrounding the industry and the manner in which the wage agreement is observed and enforced, curtails production of window glass, restricts its distribution in interstate trade, and limits the opportunity of the workers to follow their normal occupation. Upon the filing of this bill, a motion was made for a preliminary injunction. The defendants having all appeared and answered, the hearing of this motion was by agreement converted into a final hearing and the case submitted for a final decree on the merits.

Whether an agreement or combination prohibited by section 1 of the Sherman Anti-Trust Law (Comp. St. § 8820) is shown to exist depends upon the determination of certain disputed propositions, namely: (1) That this wage agreement, with the resulting combination to enforce it, relates only to the production and manufacture of hand-blown window glass, and not directly to interstate commerce therein, but, if interstate commerce is affected or restrained thereby, such restraint is so indirect or incidental as not to be within the law; (2) that this wage agreement is a lawful means of carrying out the legitimate objects of a labor organization instituted for purposes of mutual help, and is therefore exempt from the provisions of the Sherman Anti-Trust Law by section 6 of the Clayton Act (Comp. St. § 8835f), even though it may indirectly and incidentally curtail production or restrict interstate trade in hand-blown window glass; (3) that, even if this wage agreement and the resulting combination to enforce it do restrict interstate trade and curtail production of hand-blown window glass, such restrictions are not so unreasonable under all the circumstances of the case as to be illegal and within the law. The government asserts the contrary of all these

contentions and that an illegal agreement and combination is shown directly and necessarily restraining and intending to restrain interstate trade or commerce in hand-blown window glass.

Before considering the law relating to these several propositions, a brief statement of the facts is deemed necessary. The controlling facts are not in dispute. A wage committee, acting for and on behalf of the National Association of Window Glass Manufacturers, on or about September 16, 1922, entered into an agreement with a wage committee acting for and on behalf of the National Association of Window Glass Workers. This Association of Manufacturers comprises substantially all the makers and producers of hand-blown window glass. Their factories are located in various states of the Union, among others, Pennsylvania, West Virginia, Ohio, Indiana, Illinois, Kansas, Oklahoma, Arkansas, and Louisiana. The bulk of their product.is sold and shipped in interstate commerce in the usual manner, and in large part through the Johnston Brokerage Company, the principal office of which is at Pittsburgh, Pa. The National Association of Window Glass Workers comprises all the skilled workmen in the hand-blown window glass industry. This trade is highly skilled. It is undisputed that there are no skilled workmen other than members of this organization, and that no manufacturer who cannot obtain a wage scale from this association can operate his factory or produce hand-blown window glass. This is true, not merely because there are no other available workers, but because members of the Workers' Association will not work in any factory which has not been given a wage scale such as was agreed to by the respective wage committees of the two associations.

The wage agreement now in force, and agreed upon on or about September 16, 1922, contains the following provision of which the government complains, namely:

"This wage agreement shall be in effect from September 25, 1922, to January 27. 1923, during which period the scale shall be in full force for 16 weeks or 96 working days, and from January 29, 1923, to June 11, 1923, during which time the scale shall be in force for 18 weeks or 108 working days."

Thus it appears that the factories are required to operate upon what is called a two-period system. The manufacturers are divided into two' groups, called group A and group B. All are required to sign this wage agreement and must operate subject to the time limitations thus imposed. When this agreement took effect, it is said there were 65 factories in existence equipped to make hand-blown window glass. but of this number 56 only expressed a purpose to operate during the ensuing year. The half classified in group A, having signed the agreement, were in a position to operate during the first period of 16 weeks, and the other half, after having signed the agreement, were in a position to operate during the second period of 18 weeks. The plan of operation thus contemplated is the one which has been and is being followed.

No operator is given a wage agreement permitting him to operate during both periods, unless he shall have two separate factories and should be willing to operate one only during the first period, and close it at the time he opens the other for operation during the second period.

No operator having only one plant has been furnished a wage agreement permitting him to operate continuously during both periods. All applications under this agreement, and, as the evidence shows, under prior agreements of like nature, for permission to operate continuously through two periods, have been denied, except with a few rare exceptions, depending on special circumstances. The testimony shows that a number of applications have been made by factories operating under the present agreement in the first period, for permission to continue to operate in the second period, and that all of them have been refused. The testimony also shows that in the preceding year, under a similar agreement, an operator who desired to equip a second factory, so that he might continue production during the second period, was compelled, before being given a wage scale, to build an entirely independent factory, and not merely an additional furnace and equipment, at a cost of $75,000.

It must therefore be found that the true purpose and intent of all parties concerned is and has been that one-half of the manufacturers of hand-blown window glass should operate, produce glass, and sell and distribute it only during the first period, from September 25, 1922, to January 27, 1923; that they should then close their several plants and keep them idle during the remainder of the year; that the other group should keep their plants idle and out of operation during the first period, and that they should then, at the beginning of the second period, open their plants and put them into production from January 29, 1923, to June 11, 1923, at which time they should again close down and keep their plants idle during the remainder of the year. That this result was to be effected by means of the present wage agreement and by the division of the manufacturers into two groups, neither operating at the same time, but only in successive periods, must also be held to be fully established by the evidence.

This organization of the industry into two periods began in the year 1918. The circumstances leading up to this organization bear materially on the intent of the parties in continuing it. The two-period system owes its existence to the restrictions imposed by the United States government during the war upon nonessential industries, in order to conserve fuel and labor. An order was made in the latter part of 1917, limiting the production of hand-blown window glass during 1918 to one-half of that which had been produced in the preceding year. This reduced quantity was agreed upon in conference between representatives of the Manufacturers' and Workers' Associations, on the one hand, and the proper authorities of the United States government, on the other. The quantity agreed to as one-half the production for the preceding year was 1,263 boxes per shop or pot. At the time this conclusion was arrived at a number of factories were idle, owing to the scarcity of gas and other fuel, resulting from an exceptionally severe winter, and thereupon the factories then idle refrained from resuming operations until the others then in operation had produced their respective quotas. As a result of this enforced restriction on production, it was discovered by the representatives of the workers, if not of the manufacturers, that this two-period system of operation was beneficial and advantageous, and the industry has ever since

been operated in this way. Certain reasons are advanced which it is claimed show that production is not diminished nor prices enhanced, and that advantages both to the workers and manufacturers are secured without injury to the public, and these are relied on to show that the agreement and combination is not unreasonable nor illegal. The facts bearing thereon will be stated later.

Certain conclusions must be deduced from the foregoing facts. One half of the productive capacity of the hand-blown window glass industry agrees not to operate while the other half is in operation. This being true, the half which is to operate for the first period of 16 weeks must of necessity limit its total production and sale of hand-blown window glass to that quantity only which can be produced in a period of 16 weeks. The same is true of factories which agree to operate only during the second period of eighteen weeks. The inherent and necessary result of this method of operation is to curtail production of hand-blown window glass. This is so obvious that testimony to prove it would not strengthen one's conviction. Testimony that it does not so result would not produce conviction, but would suggest that other causes were responsible for the limited production of previous years with which the comparison is made. Another result is that the first group of factories must in 16 weeks, and the second in 18 weeks, make enough profit to pay all expenses of operation and yield some return on the capital invested. If this result is not accomplished, then obviously all such factories must sooner or later go bankrupt. The inherent and inevitable tendency of this situation is to induce manufacturers to market this limited quantity at a price higher than would otherwise be required, if the output were larger. This tendency also is so inevitable that evidence to prove it is not required, and testimony to the contrary would produce no more conviction than would the testimony that a contract to do work at cost plus 10 per cent. is more economical than competitive bidding between independent contractors.

Another conclusion seems to me inevitable, although vigorously disputed by defendants. Trade or commerce, as well as the manufacture and production of hand-blown window glass, must be held to be restrained, and it seems to me that interstate trade or commerce therein is necessarily and directly restrained and competition therein obstructed. As already said, the producing factories are widely distributed in different states; the greater part of each factory's product has been and ordinarily is sold and shipped in interstate commerce. The larger part of the total product is marketed through the Johnston Brokerage Company, with offices in Pittsburgh, Pa. The effects of the agreement and combination, as disclosed by the foregoing facts, affect directly trade throughout the entire country in this necessary product. The necessary and inevitable effect is to restrain directly, and not merely incidentally, that interstate trade or commerce. The considerations to the contrary urged by defendants to show that their acts relate directly only to manufacture will be stated later in connection with the third proposition of law relied on.

[1] 1. The facts of this case, as above stated, bring it within the authorities which hold that interstate trade and commerce are unrea-

sonably restrained, and do not leave it within those authorities which hold that manufacture only is directly affected, and interstate trade therein affected only so indirectly as not to come within the law. Among the cases supporting this conclusion are the following: Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 238, 20 Sup. Ct. 96, 44 L. Ed. 136; Swift v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865; United States v. Reading, 226 U. S. 326, 367, 33 Sup. Ct. 90, 57 L. Ed. 243; United States v. Freight Association, 166 U. S. 290, 341, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Thomsen v. Cayser, 243 U. S. 66, 84, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322; United States v. Patten, 226 U. S. 525, 541, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 49, 33 Sup. Ct. 9, 57 L. Ed. 107; American Column & Lumber Co. v. United States, 257 U. S. 377, 399, 42 Sup. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093.

An extended review of these authorities is unnecessary and would unreasonably prolong this opinion. A re-examination of these cases discloses, it seems to me, a remarkable consistency, both in the principles of law announced and in the class of agreements and combinations which have been denounced. It will be sufficient to quote the law as stated in a few cases. In American Column & Lumber Co. v. United States, 257 U. S. 377, at page 400, 42 Sup. Ct. 114, at page 117 (66 L. Ed. 284, 21 A. L. R. 1093), Mr. Justice Clarke, speaking for the court, says:

"It has been repeatedly held by this court that the purpose of the statute is to maintain free competition in interstate commerce and that any concerted action by any combination of men or corporations to cause, or which in fact does cause, direct and undue restraint of competition in such commerce falls within the condemnation of the act and is unlawful. In Northern Securities Co. v. United States, 193 U. S. 197, 337, it is declared that 'in all the prior cases in this court the Anti-Trust Act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce.' In United States v. Union Pacific R. R. Co., 226 U. S. 61, 87, decided in 1912, long prior to the forming of their combination by the defendants, the law was condensed into this expression: 'To preserve from undue restraint the free action of competition in interstate commerce was the purpose which controlled Congress in enacting this statute, and the courts should construe the law with a view to effecting the object of its enactment.' And in Eastern States Retail Lumber Dealers' Association v. United States, 234 U. S. 600, 609, it was said: 'It (the Sherman Act) broadly condemns all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce.' And again, on page 613: 'The argument that the course pursued is necessary to the protection of the retail trade and promotive of the public welfare in providing retail facilities is answered by the fact that Congress, with the right to control the field of interstate commerce, has so legislated as to prevent resort to practices which unduly restrain competition or unduly obstruct the free flow of such commerce, and private choice of means must yield to the national authority thus exerted.'"

In Thomsen v. Cayser, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322, Mr. Justice McKenna, delivering the unanimous opinion of the court and dealing specially with the so-called rule of reason announced in the Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and the Tobacco Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, says:

"But the cited cases did not overrule prior cases. Indeed, they declare that prior cases, aside from certain expressions in two of them, or asserted implications from them, were examples of the rule and show its thorough adequacy to prevent evasions of the policy of the law 'by resort to any disguise or subterfuge of form,' or the escape of its prohibitions 'by any indirection.' And we have since declared that it cannot 'be evaded by good motives,' the law being 'its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of the parties, and it may be of some good results.' "

In National Cotton Oil Co. v. Texas, 197 U. S. 115, 129, 25 Sup. Ct. 379, 382 (49 L. Ed. 689), Mr. Justice McKenna, again speaking for the court, says of the Sherman Act and kindred statutes:

"According to them, competition, not combination, should be the law of trade. If there is evil in this, it is accepted as less than that which may result from the unification of interest, and the power such unification gives. And that Legislatures may so ordain this court has decided."

In United States v. Union Pacific R. R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124, the court had under consideration a case of precisely the same nature as the Northern Securities Co. Case, and the opinion holding the agreement between two independent trunk lines of railway was within the law was unanimous. Attention is directed to Mr. Justice Day's opinion as containing a careful review of the law.

The present case falls clearly within the principles announced in the foregoing cases. An examination of those cases fully supports our conclusion that not only is the restraint here imposed unreasonable and illegal, but that the necessary and inevitable effect is unduly to restrain trade and commerce, not only within, but between, the several states of the Union.

[2] Defendants cite certain authorities to support the proposition that the manufacture and production of articles is not interstate trade or commerce, even though there may be a present intention to sell and ship them in such trade or commerce. The proposition of law is sound and supported by the authorities cited. Among the cases cited are, Gable v. Vonnegut Mchy. Co. (6 C. C. A.) 274 Fed. 66, in which a strike of employees over wage and working conditions was held not directly to affect interstate commerce in the product of the factory, even though some part of it was shipped in interstate commerce; Hammer v. Dagenhart, 247 U. S. 251, 272, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, in which the Child Labor Law, forbidding the shipment in interstate commerce of the products of a factory in which children under certain ages were employed, was held not to be within the powers conferred on Congress by the interstate commerce clause of the Constitution; United Mine Workers of America v. Coronado Coal Co., 42 Sup. Ct. 570, 66 L. Ed. 975, decided June

5, 1922, by United States Supreme Court in which it is said that obstructing the operation of a mine by illegal strike methods is not of itself an unreasonable restraint of or interference with interstate commerce notwithstanding some of the coal mined was ordinarily shipped in interstate commerce; Heisler v. Thomas Colliery Co., 43 Sup. Ct. 83, 67 L. Ed. ——, decided by United States Supreme Court November 27, 1922, in which the Pennsylvania state tax on each ton of anthracite coal mined was held not to be a burden upon interstate commerce, although a large part of the coal was ordinarily shipped beyond the state.

[3] The inapplicability of these cases is apparent upon a consideration of the facts above summarized. In this case the wage agreement, and the combination to enforce it, is not merely one to obtain a certain rate of wages or working conditions from an unwilling operator by illegal strike methods. Here the interference with interstate commerce is not merely ancillary and incidental to the execution of that purpose and outside of the real intent of the parties to the combination. What the parties to this combination agreed to do, and have done, has such a direct, material, and substantial effect upon the production, distribution, and price of hand-blown window glass in interstate trade or commerce that an intent to restrain such trade or to curtail and restrict competition therein must be inferred. The parties must be held to have intended the necessary and direct result of their agreement and combination, no matter what the motives were which induced them to enter into it. They have purposely and intentionally made an agreement and engaged in a combination which necessarily and directly produces consequences which the statute was designed to prevent, and they must in law be charged with intending those consequences. Such is the usual rule for weighing the acts of parties, even in criminal cases. Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 49, 33 Sup. Ct. 9, 57 L. Ed. 107.

[4] 2. That section 6 of the Clayton Act does not exempt defendants or any of them from the provisions of the Sherman Anti-Trust Law follows from a number of considerations. Section 6 in substance provides that the anti-trust laws shall not forbid the existence and operation of labor organizations "instituted for the purposes of mutual help, * * * or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof." I do not deem it necessary to determine what are the purposes of mutual help for which a labor organization may exist, or what are the lawful means, or the legitimate objects which are protected by the section. Some aspects thereof have already been considered by the Supreme Court, and its decisions are sufficient for our present purpose. See In re Debs, 156 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; Loewe v. Lawlor, 208 U. S. 275, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Duplex Printing Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; United Mine Workers of America v. Coronado Coal Co., supra, decided June 5, 1922. Of

these cases, the first four were decided prior to the adoption of the Clayton Act, and the other two since; but the authority of the first group was reaffirmed, notwithstanding the adoption of section 6.

All these cases agree that a combination or agreement having for its object and purpose the restraint of or undue interference with interstate trade or commerce is not a legitimate object of a labor organization, nor a lawful means of carrying out its objects. If the members of a labor organization, either alone or in combination with others, enter into such a combination, they are as much subject to the Anti-Trust Law as any one else, notwithstanding the provisions of section 6. If I am right in my conclusion that the Manufacturers' Association and the Workers' Association have made an agreement or combination, the necessary purpose and the inevitable effect of which is to restrain unduly interstate trade or commerce, it follows that the provisions of the Sherman Anti-Trust Law apply. In the present case the Workers' Association have not limited their efforts to negotiating a wage scale or fixing working conditions. They have made themselves parties to an agreement, and entered into a combination to enforce it, whereby one-half of the factories are to operate for one period while the others remain closed. They have assumed the leading rôle in thus classifying the factories into two groups. They seem to have assumed the entire burden of enforcing vigorously and relentlessly this two-period method of operation and in preventing all manufacturers from operating otherwise than in this restricted manner. Their activities go much beyond any question of wages or working conditions. Their activities deal with and affect the entire industry, including the sale and distribution in interstate commerce of the product of that industry. Upon principle this case is undistinguishable from Loewe v. Lawlor and Duplex Printing Co. v. Deering, above cited. It would seem also to be clearly within the principles of Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, wherein one dealer alone was prevented from obtaining supplies.

[5] 3. But it is said that the restraints are reasonable and the Sherman Anti-Trust Law, as construed in the Standard Oil and Tobacco Co. Cases, prohibits only unreasonable restraints. This proposition is supported by invoking certain facts relating to the hand-blown glass industry. These facts, in their aspect most favorable to defendants, are set forth in their respective answers.

This industry, it is said, is a dying industry; that about the year 1903 machines were invented for blowing window glass, and that the hand-blown glass industry is not capable normally of meeting this competition. It is further said that hand-blown window glass can be made only by skilled workmen; that a long period of training and apprenticeship is necessary to acquire this skill; that the number of workmen is and has been limited and is diminishing; that there are less than 1,000 blowers, members of the Workers' Association, whereas more than 2,000 are required to man fully all of the factories; that these conditions, and particularly the foreseeable consequences of the competition of the machine-blown glass factories, make it impossible to procure and train new workers, or to keep them in the industry after

they are trained. Hence it is urged that it is both reasonable and necessary to divide the factories into two groups and two periods for operation, so that each factory may be fully manned for part of the time, thereby preventing disastrous competition between factories for workers and the demoralization to the workers from shifting from factory to factory. As a result it is insisted the total product of hand-blown glass is increased, and prices not enhanced, and that the workers have a longer total working period in each year and earn more money.

Defendants' third proposition rests upon these fundamental facts, namely: That there are only half enough workers to man the plants fully, and that workers are not obtainable otherwise than through the workers' organization. That this method of operation drives workers· from the industry seems to me to be conclusively shown by the evidence. In May, 1922, a vote of the membership was taken upon what is called the Premier resolution, urging the officers and committees of their association to procure a return to one continuous period of operation. The reasons stated in that resolution seem self-evident. The vote was two to one in its favor. The question was again submitted to a vote in August, 1922, and resulted in four to one in favor of abandonment of the two-period system of operation. The evidence is clear that this method of operation requires a greater or less number of workers to leave their homes and travel from place to place in search of employment, thereby burdening the industry as well as the workers with heavy additional expense. It tends to prevent the workers from establishing a fixed abode convenient to a satisfactory employer, and the effect of this upon workers having a family and friends is too obvious to require proof. It likewise prevents factories favorably situated from building up and holding together a working force ready and willing to work as long as the factory can operate and find a market for its product. It places the least favorably situated and the most wastefully operated factory upon the same plane with the most favorably situated and economically operated factory. As regards the factories themselves, its tendency necessarily is to keep alive factories which have no economic justification for existence, and furnishes them a support at the expense of the public and other factories.

It is urged that since 1918 the total production of hand-blown window glass has not been diminished; that the number of weeks' work in each year in which the workers have been able to labor has been increased; that the retail price of window glass has not been enhanced, because that price is really fixed by the American Window Glass Company, a machine-blown glass industry. These contentions depend upon so many considerations that I cannot regard them as proved. On the whole, nothing appears to distinguish the effects of this agreement and combination from the effects upon industry and trade of like agreements in other situations. Nothing appears to indicate a reversal in this situation of the usual laws of trade. It does not appear that production is not curtailed, that prices are not enhanced, nor that the cost of production is not increased. In these directions the natural tendency is undoubtedly producing its usual effects, even though not as yet plainly evident. It does appear, however, that competition in produc-

tion and distribution between group A and group B factories is suppressed, that the cost of producing glass is increased, and this tends to enhance the price to the consumer, and that opportunity to employees to work and earn wages is limited and restricted.

These considerations alone require that defendants' third proposition be denied. A few words, however, may be added, bearing upon the so-called rule of reason as applied to the Sherman Anti-Trust Law. Undue weight, it seems to me, is attached to differences of opinion as to the proper construction of that law to be found in the cases preceding the Standard Oil Company and the American Tobacco Company Cases and to the rule then established. These cases do not overrule any previous case, but, on the contrary, Mr. Chief Justice White, in delivering the opinion, expressly approves the results in United States v. Freight Traffic Association and United States v. Joint Traffic Association, in which those differences of opinion had been most forcibly expressed. On the contrary, the agreements denounced in those two cases were said to be typical examples of the kind forbidden by the construction of the Sherman Anti-Trust Law then being pronounced. An examination of the later cases, and of the agreements and combinations which have been condemned, shows no relaxation of any of the principles declared in any of the cases previously decided. My examination persuades me that no prior case would have been differently decided, had the rule of construction announced in the Standard Oil Company Case been adopted originally as the rule. In Thomsen v. Cayser, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322, Mr. Justice McKenna, referring to the Standard Oil Co. and Tobacco Co. Cases, says:

"But the cited cases did not overrule prior cases. Indeed, they declare that prior cases, aside from certain expressions in two of them or asserted implications from them, were examples of the rule."

An inspection of the later cases will support Mr. Justice McKenna's statement, and particularly my view that since the Standard Oil Co. Case the law has been applied at least as rigorously, if not even more so, to condemn agreements and combinations which, by reason of the intent or the inherent nature of the contemplated acts, prejudice the public interest, unduly restricting competition or unduly obstructing the course of trade. See Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232; Eastern Retail Lumber Dealers' Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107; Thomsen v. Cayser, supra, and particularly American Column & Lumber Co. v. United States, 257 U. S. 377, 42 Sup. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093. This last case, I believe the profession will agree, is perhaps the most extreme application of the Anti-Trust Law to be found in any Supreme Court decision. The same conclusion follows from the series of price-fixing cases. See Dr. Miles Medical Co. v. Park & Sons, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; United States v. A. Schrader's Sons, Inc., 252 U. S. 85, 40 Sup. Ct. 251, 64 L. Ed. 471; Frey & Son v. Cudahy Packing Co., 256 U. S. 208, 41 Sup. Ct. 451, 65 L. Ed. 892; Federal

Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 445, 42 Sup. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882.

After the decision in United States v. Colgate, 250 U. S. 300, 39 Sup. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443, some judges of the lower courts, as a result thereof and in view of the provisions of section 2 of the Clayton Act (Comp. St. § 8835b), manifested a disposition to apply a more liberal, if not a more reasonable, rule to resale agreements having for their object the prevention of cut-throat competition and the demoralization of trade. See United States v. A. Schrader's Sons, Inc. (D. C.) 264 Fed. 175; Beech-Nut Packing Co. v. Federal Trade Commission (C. C. A.) 264 Fed. 885. The prompt reversal of these cases demonstrated the error of this belief and re-established the uniform rule that price-fixing agreements or combinations had such an inherent and necessary tendency to suppress competition and enhance prices that no proof of good motives or beneficial results could take them outside of the Sherman Anti-Trust Law or bring them within the reasonable rule of the Standard Oil Co. Case.

That Chicago Board of Trade v. United States, 246 U. S. 231, 38 Sup. Ct. 242, 62 L. Ed. 683, relied on by defendants, is not in point, is sufficiently evidenced by Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300, in which a similar regulatory rule of a more drastic nature was held not to be within the law. It is evident that the Supreme Court has never regarded regulatory rules of this nature as within the law. It cannot, therefore, be regarded as having intended by the later case to declare a rule limiting in any wise the authority of the long line of anti-trust cases to which reference has been made.

Upon the merits the decree must be for the plaintiff. The proper form of decree may be submitted by counsel. As indicated in my observations refusing to continue the restraining order in force, defendants should be given a reasonable time to comply with the decree to be entered. It seems to me that the time intervening prior to the 1st of March will be a reasonable time, and that the terms of the decree, including its injunctive features should become effective not later than that date.