**AMERICAN TOBACCO CO. et al. v. UNITED STATES.**

**LIGGETT & MYERS TOBACCO CO. et al. v. SAME.**

**R. J. REYNOLDS TOBACCO CO. et al. v. SAME.**

Nos. 9137–9139.

Circuit Court of Appeals, Sixth Circuit.

Dec. 8, 1944.

Writ of Certiorari Granted March 26, 1945.

See 65 S.Ct. 864.

98

No. 9137:

Geo. W. Whiteside, of New York City, and Floyd Williams, of Cincinnati, Ohio (Chadbourne, Wallace, Parke & Whiteside, of New York City, Hunt, Bush & Lisle, of Lexington, Ky., and George W. Whiteside and Ralph D. Ray, both of New York City, on the brief), for appellants.

No. 9138:

Bethuel M. Webster, of New York City (Bethuel M. Webster and Charles Dickerman Williams, both of New York City, J. Craig Bradley and Victor A. Bradley, both of Georgetown, Ky., and Charles F. Wheaton, of New York City, on the brief), for appellants.

No. 9139:

B. S. Womble, of Winston-Salem, N. C., and H. F. McGuire, of New York City (Frederick H. Wood and Harold F. McGuire, both of New York City, B. S. Womble, of Winston-Salem, Thomas T. Cooke, of New York City, Richard C. Stoll, of Lexington, Ky., and L. P. McLendon, of Greensboro, N. C., on the brief), for appellant.

Herbert Borkland and Milton A. Kallis, both of Washington, D. C. (Wendell Berge, Herbert Borkland, Carson Glass, Edward S. Stimson, and Margaret H. Brass, all of Washington, D. C., and John T. Metcalf, of Lexington, Ky., on the brief), for appellee.

Before HICKS, HAMILTON, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The American Tobacco Company, Liggett & Myers Tobacco Company, and R. J. Reynolds Tobacco Company, together with certain of their officials and a subsidiary of one of the companies, were convicted by a jury, in the district court, on counts of conspiracy in restraint of trade, attempt to monopolize, conspiracy to monopolize, and monopolizing in the tobacco industry, in violation of the Sherman Anti-Trust Act.[1] They were each fined an aggregate of $15,000 on three of the counts, or a total of $255,000. On the count of attempting to monopolize, no fines were assessed, for the reason that this offense was held to be merged in the offense of monopolizing. The allegations of fact are the same for each count on which the parties were convicted.

Appellants claim that there was no evidence showing any violation of the antitrust law; that, inasmuch as the evidence was as consistent with innocence as with guilt, a verdict should have been directed in their favor; that they were convicted on evidence obtained by unlawful search and seizure; that the trial court erred in its instructions to the jury; that appellants were deprived of their legal rights in the challenge of jurors for cause; that they were denied a sufficient bill of particulars; that the charge of the district court to the jury was insufficient and inadequate; that Government counsel indulged in prejudicial argument to the jury; and that improper admission of irrelevant and immaterial evidence constituted prejudicial, reversible error.

The Government's case was based upon the practices and conduct of appellants in their purchases in the tobacco market, and in their sales and systems of distribution; and it is alleged that they all combined and conspired in carrying out such practices. For convenience, the designation "appellants" may be hereafter interchangeably used in referring either to the corporations alone, or to both the corporations and individuals making the appeal.

---

[1] 15 U.S.C.A. §§ 1 and 2.

With the decree of dissolution of The American Tobacco Company in 1911,[2] there emerged from the combination thereby held to be illegal the three companies, American Tobacco Company, Liggett & Myers Tobacco Company, and R. J. Reynolds Tobacco Company, which, since that time, have continued to retain their place as the three largest tobacco companies in this country. It is unnecessary, at this point, to describe the origin of these corporations, or their growth, except to remark upon their size, wealth, and power, as those considerations, in view of the issues in this case, are pertinent. As some indication of the enormous growth of the companies, however, it may be observed that in the manufacture, in this country, of cigarettes alone, 38,598,128 pounds of leaf tobacco were used in 1911; in 1939, the amount so used, had increased to 509,107,672 pounds.

In 1929, the three companies above named produced 91% of the cigarettes manufactured in the United States; but this percentage of production has diminished since that time, until, in 1939, they produced 68% of the cigarettes manufactured in the United States, or an aggregate of approximately 123 billion cigarettes out of a total of approximately 181 billion manufactured in the country. In the same year, 1939, they produced 63.5% of the smoking tobacco, and 44.22% of the chewing tobacco manufactured in the United States. Their net profits for 1939, after payment of expenses, taxes, interest, depreciation, etc., were, for American, $26,427,934.28, for Liggett & Myers, $20,705,549.13, and for Reynolds, $25,645,455.09, or an aggregate of $72,778,-938.50 for the three companies. For advertising, alone, the three companies, during the above period, disbursed a total of $40,-776,771.37. In the same year, the tangible assets of American amounted to $237,130,-931.57, of Liggett & Myers, $181,453,497.-39, and of Reynolds, $176,709,822.23; their combined tangible assets amounted to $595,-294,251.19; and their combined tangible and intangible assets amounted to $649,393,-683.59. These figures and amounts vary through the preceding years, but the changes are not such as derogate from the wealth, power, and outstanding importance of the three companies in the tobacco industry, or controvert the fact that their united resources, purchases, production, and sales were and are far greater than all other tobacco companies combined.

Among the circumstances concerning which there is no dispute, it appears that each of the companies consistently has tobacco stocks on hand to last approximately three years. The value of these stocks is more than $100,000,000 for each company, and assures their independence of the market in any particular year. In the hands of the tobacco farmers, the crop is perishable, as it requires a certain redrying treatment or process. Unless it has been redried, it cannot be stored for sale in another season, and the farmers have no facilities for such processing. Hence, it is seen that the farmers must sell their crop in the season in which it is raised, or lose it. Tobacco is sold by auction in various warehouses located in several states. For the most part, the tobacco offered for sale is piled in baskets, arranged in rows along the floor of the warehouse in orderly fashion. The tobaccos involved in this case are the flue-cured, burley, and Maryland tobaccos. Foreign companies purchase the larger share of flue-cured tobacco, for foreign consumption. Appellants purchase the greater part of the remainder for blending in their tobacco mixtures, and also buy the greater part of the burley and Maryland crops. The tobacco is purchased at 75 flue-cured markets, 42 burley markets, and 4 Maryland markets.

Appellants contend that there was no evidence of agreement, combination, and conspiracy to restrain trade or monopolize. This, the Government claims, is proved by circumstantial evidence, and it is maintained that all reasonable inferences drawn therefrom by the jury, sustain the convictions of appellants. While the entire body of the evidence has been reviewed, we shall not here outline the whole of it, or refer to all of the various arguments that have been directed to different aspects of the proofs. In restating various portions of the evidence as showing the existence of certain facts, we are mindful that contrary interpretations might be indulged in, or opposite inferences drawn. Parol testimony adduced by the Government is in some instances rendered subject to certain qualifications by documentary evidence introduced by appellants. How far such qualifications extended, or whether it was suffi-

[2] See United States v. American Tobacco Co., D.C., 164 F. 700; 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; C.C., 191 F. 371.

cient to permit a partial, or complete, disregard of the Government's proofs in any given instance, was a question for the jury to determine. In view of the jury's verdict, our consideration shall be limited, in this regard, to determining whether there was substantial evidence to support the verdict, and, in reciting what the proofs demonstrate and arriving at our conclusions, we shall take that view of the evidence, and the inferences reasonably to be drawn therefrom, which is most favorable to the Government.

The alleged combination, relating to the purchase of leaf tobacco by appellants, as well as to the sales and distributions of their finished or manufactured products, we shall next consider; and in discussing the proofs relied upon by the Government to establish appellants' violation of the Sherman Act, we will first address ourselves to their activities and methods in the purchase of leaf tobacco on the auction markets and, subsequently, to their conduct in the sales and distribution of their manufactured products.

In support of its contention that appellants combined to fix and control prices of leaf tobacco on the auction markets, the Government relies upon evidence showing that such concerted illegal action was carried on by various devices and methods. First, the Government introduced proof that each appellant company refuses to purchase tobacco on any of the markets, unless all of them are represented thereon. Appellants admit that this is their policy, and that they carry it out. There have been several attempts to open new tobacco markets, but none of the appellants would participate unless all were present, and, consequently, such markets were failures because of the absence of buyers. The reason for such failure of a market when appellants are not represented by buyers, is that the tobacco farmer does not want to sell his tobacco on a market in which the purchasers are speculators or dealers, because the prices bid under these circumstances are usually low, inasmuch as such purchasers must eventually sell to the manufacturing companies, and the farmer thereby loses that part of the profit that goes to the middleman. Thus, it appears that, as a practical matter, no new market can be opened unless the appellant companies agree to participate. They, together, purchase the major part of the crop. The for-

eign purchasers, likewise, do not participate without the presence of appellants. It may be said, therefore, that appellant companies, by their agreements between each other— or their understood policies—decide, in combination, upon the number of tobacco markets to be held and their location, and in arriving at such determination, they consult with each other as to whether one community or another deserves a market.

Among the methods which the Government claims appellants use, with the design and effect of controlling prices of leaf tobacco, are limitations and restrictions, before the markets open, on the prices which their buyers are permitted to pay for tobacco; maintenance of price ceilings which, as a result of agreement between them, none exceeds; stabilization and fixing of prices through percentage buying; formulation of certain grades of tobacco in such a way as to result in an absence of competition among them in their tobacco purchases; and combining to manipulate and raise the price of lower-grade tobaccos in order to eliminate competition from manufacturers of lower-priced cigarettes.

It appears that each of the three companies, prior to the opening of the yearly markets, calls its buyers in and gives them instructions as to the prices to be paid for the leaf tobacco that is to be purchased on each of the various markets. These price instructions are in terms of top prices or in terms of price ranges which, in effect, are the same thing. Each company also instructs its buyers as to the percentage of tobacco which it is purchasing on each market. Their price ceilings, from the evidence of the Government, appear to be the same. So rigid, in many cases, are the price ceilings thus maintained from time to time by appellant companies, that under a custom permitting the auctioneer, in case of tie bids, to award the sale to the bidder who bids first, buyers representing appellants often make their bids ahead of the auctioneer, before an opening price can be announced, on various baskets of tobacco, so that they may have their claim to the tobacco, at the understood ceiling price recognized, in case of tie bids. It also appears that often a buyer bids ahead of the auction sale starter, by indicating that he wants a certain basket further along in the line, and, in such cases, the tobacco in question is awarded to such buyer without the mention of any price, it being understood that,

without mention of price, it is sold at the top or ceiling price theretofore previously determined upon.

Further relied upon—to sustain the Government's contention that top prices are agreed upon beforehand between the appellants—is evidence that, often, where one or two of the appellant companies have secured their percentage of the crop on a certain market, or are not interested in the purchase of certain offerings of tobacco, their buyers will nevertheless enter the bidding in order to force the other company to bid up to its price limit. Appellants are not so much concerned with the prices they pay for leaf tobacco, as that each of them will pay the same price for the same grade; that no one of them will secure any advantage in purchasing tobacco; and that they will all be on the same basis as far as the expenses of their purchases go. There is evidence to sustain the conclusion that the prices which are set as top prices by appellants, or the first of them to purchase on the market, become, with few exceptions, the top prices prevailing on the markets. Moreover, it could be reasonably concluded that, because of the vast capital resources, purchases, and power of appellants, they are able to set top prices and control the prices paid on the auction markets.

Much of the foregoing relates to purchasing devices alleged to have been used by appellant companies when engaged in buying the same grades and kinds of tobacco. However, there is also evidence that competition among them is eliminated in still another way—through the purchase of grades of tobacco in which only one of the companies is interested. There is proof that each company formulates the grades which it alone purchases; that the other companies recognize the grades so formulated as distinctive grades and do not compete for them; and that, while the differences between the grades of tobacco so formulated are distinguishable by the highly trained expert buyers, they are, in reality, so minute as to be inconsequential.

It does not follow, however, that any one of the appellant companies can buy at any price it wishes to bid for its specially formulated grades of tobacco. The other companies prevent that. While the latter do not wish to compete for such grades, and keep away from the grades of another company, as far as purchasing goes, their buyers often bid on such grades of tobacco, with the sole object of forcing the com-

pany interested in such purchase, to bid its top price limit; and these buyers for the companies that do not actually want to purchase the offerings in question, bid as high as they feel they may risk without being awarded the sale.

In yet another way, it is contended by the Government, appellant companies make use of a method of purchasing, with the object and result of eliminating competition between them. Each company determines in advance what portion of the entire crop it will purchase before the market for that season opens. The three companies then, separately, inform their buyers of the percentage of the crop which they wish to purchase and give instructions that only such a percentage is to be purchased on each and every market. Appellants thus spread their purchases equally and evenly over the different markets throughout the season. The evidence of the Government tends to show that, no matter what the size of the crop may be in any given season, the three appellant companies always are able to purchase their predetermined percentages thereof, within price limits determined upon by them; and that this method of purchasing by percentages of total requirements, and spreading such purchases over all markets throughout the season, is a device adapted to stabilizing the market. Each of the three appellant companies employs supervisors for purchasing, whose functions are to see that prices are the same on one market as on another. On markets where, because of certain difficulties in appraisals of grades or other similar factors, the bidding gets out of line with predetermined price limits, or there is a tendency for prices to be higher or lower than on other markets, such supervisors exert their efforts to maintain the same price, grade for grade, on the different markets. This objective is sought to be achieved by instructions from the supervisor to buyers to change the prices bid or alter the percentages purchased; and the action, taken by the supervisors, is successful in maintaining and equalizing the prices on the different markets, for the buyers are able to purchase each grade at prices given them in terms of ranges, averages, or limits.

As will more fully appear subsequently, during the course of appellants' manufacture and sale of cigarettes, other companies began to manufacture lower-priced cigarettes, made of cheaper tobacco. Thereaft-

er, for some reason, all the appellant companies commenced to make large purchases of cheaper tobacco. No explanation has ever been offered as to how or where this cheaper tobacco was used by appellants, as the grades and kinds of tobacco previously used by them, in the manufacture of their cigarettes, were of a more expensive kind, and the compositions previously formulated by them for their various brands of cigarettes, remained unchanged during the period in controversy and up to the date of trial. The Government claims that such purchases of cheaper tobacco evidenced a plan, combination, and agreement of appellant companies to deprive the manufacturers of cheaper cigarettes of the tobacco necessary for their manufacture, as well as to raise the price of such tobacco to such a point that cigarettes made therefrom could not be sold at a sufficiently low price to compete with appellants' more highly advertised and better-known brands, and that such a combination to raise prices, deprive competitors of the ingredients of their manufactured products, and eliminate competition, is illegal as being in restraint of trade. So much for the recital of evidence and inferences which, the Government urges, were reasonably to be drawn, with regard to the alleged practices of appellants in the purchase of leaf tobacco.

We come, then, to the discussion of appellants' contention that there was no evidence of violation of the Sherman Act in their conduct of the sales and distribution of their manufactured tobacco products, and we proceed, first, to take up the important question of prices and selling practices.

The leading cigarette brands produced by American, Reynolds, and Liggett & Myers, are, respectively, Lucky Strikes, Camels, and Chesterfields, and are often referred to as their leading, or standard, brands. Appellants sell and distribute their products to jobbers and to selected dealers, who buy at list prices, less discounts. But almost all of the million or so dealers in appellants' products throughout the country—consisting of small storekeepers, gasoline-station operators, and lunchroom proprietors—purchase from jobbers, who charge their profit into such wholesale prices. It is obviously a great advantage for a dealer to buy at discounted list prices—that is, at the prices jobbers or wholesalers pay for the products. Appellants term such selling to dealers at jobbers' prices, as direct selling, and refer to such dealers and jobbers as being on the "direct list."

The list prices and discounts for all three appellant companies have been practically identical since 1923, and absolutely identical since 1928. Since the latter date, 7 changes have been made—all identical in amount—by the three companies. These changes in list prices have no relationship to costs of production or to economic conditions generally. The increases were first announced by the Reynolds Company; and the other two appellants, thereupon, also increased their list prices in identical amounts.

During the two years preceding June, 1931, appellants had produced 90% of the total cigarette production in the United States. In that month, tobacco farmers were receiving the lowest prices for their crops since 1905. The costs to appellants for tobacco leaf, therefore, were lower than for the prior 25 years, and their manufacturing costs had been steadily declining for a considerable period. It was one of the worst years of financial and economic depression in the history of the country. On June 23, 1931, the Reynolds Company suddenly, and without previous notification or warning to the trade or public, raised the list price on its leading cigarette brand from $6.40 to $6.85. The same day that Reynolds increased its list price, American and Liggett increased the list prices on their leading brands of cigarettes, to the identical amount of $6.85 per thousand. It is admitted that there was no economic justification for this raise. The president of the Reynolds Company, when asked the reason for the increase, stated that it was "to express our own courage for the future and our own confidence in our industry." The president of American gave as his reason for the increase, "the opportunity of making some money." He further claimed that, because Reynolds had raised its list price, and would thereby have a large extra amount of money for advertising, American, therefore, also had to raise its price in order to have such a similar amount for advertising. The officials of Liggett & Myers claimed that they thought the increase in list prices was a mistake, as there did not seem to be any reason for making such a price advance; but it was contended by that company that unless it also raised the list price of its leading brand of cigarettes to an identical amount, the other companies would have a greater income to

spend on advertising, and would thereby put a lower-priced brand at a competitive disadvantage.

Appellants' price increase resulted in higher retail prices for their cigarettes, but loss in volume of sales. Yet, in 1932, with the sales of appellants' cigarettes falling off greatly, they were still making tremendous profits as a result of the price increase, their net profits in that year amounting to more than $100,000,000; and it is notable that this depression year was one of the three peak years in their history.

It appears that before 1931, certain smaller companies had manufactured cigarettes retailing at 10 cents per package. But before the above-mentioned year, the sales of such cigarettes were negligible. However, after the increase in list prices by the three appellant companies in 1931, the 10-cent brands began to make serious inroads upon the sales of appellants. The cheaper brands of cigarettes were sold at a list price of $4.75 per thousand, and from 1931 to 1932, the sales of these cigarettes had multiplied thirty times—from 0.28% of the total cigarette sales of the country in June, 1931, to 22.78% in November, 1932. Selling at a much lower retail price than appellants' cigarettes, the 10-cent brands were welcomed by the public and began to be purchased by millions during the worst depression years.

Appellants apparently perceived that the decrease in the volume of sales constituted a threat to their predominant position in the industry. Thereupon, as the Government contends, appellants, in combination, determined upon a plan to eliminate the threat of competition from the manufacturers of the 10-cent brands; and the basis for this claim is founded on the circumstances, here to be related.

In January, 1933, appellants slashed the list prices of their three leading brands in identical amounts: from $6.85 per thousand to $6.00 per thousand. In February, 1933, appellants made a second drastic decrease in their list prices: from $6.00 per thousand to $5.50 per thousand. The evidence strongly tends to show that the cut in list prices was directed at the competition of the 10-cent cigarettes. Reports that had previously been sent in by various officials and representatives, to their companies, told of appellants' brands losing in competition with the 10-cent brands. Of course, where the competition with the cheaper brands had to be met, was in the

retail prices to the public; and appellants' cut in list prices would not, in itself, necessarily result in such lower retail prices. True, this would ordinarily follow; but appellants were interested in a sufficiently low retail price for their products so that they would defeat the threat from the lower-priced cigarettes; and, in their campaign against the 10-cent brands, appellants found that, in order to succeed in their objective, it was necessary that there be not more than a three-cent differential per package at retail between the cheaper cigarettes and their own brands. It appears that an increase of even a penny in the above-named differential, gave an enormous sales advantage to the 10-cent brands, in spite of the many millions of dollars that had been spent in advertising the claimed merits and qualities of appellants' cigarettes.

Appellants' cut in their list prices, and the subsequent reductions in retail prices of their products, resulted in a victory over the 10-cent brands. During the campaign, it appears, from letters of appellants' representatives to their companies, that they communicated progress of the battle, giving an account from time to time, of the decline in sales of the 10-cent brands because of the price reductions on the "15-cent brands" and voicing prophecies that certain of the 10-cent brands would "pass out of the picture."

Following the first price cut by appellants, the sales of the 10-cent brands fell off considerably. After the second cut, they fell off to a much greater extent. When the sale of the 10-cent brands had dropped from 22.78% of the total cigarette sales in November, 1932, to only 6.43% in May, 1933, appellants, in January of 1934, raised back the list prices on their standard brands from $5.50 to $6.10 per thousand. During the period that the list price of $5.50 per thousand was in effect, Camels and Lucky Strikes were actually being sold at a loss by Reynolds and American; and Liggett was forced to curtail all its normal business activity and cut its advertising to the bone in order to sell at this price. However, after the price increase in 1934, appellants again, in 1937, increased the list prices on the above-named brands to $6.25 per thousand, and in July, 1940, again raised their list prices—oddly enough—to $6.53 a thousand.

Deserving of some scrutiny are the methods used to secure reduction of retail prices, after the drastic list-price cuts were

made by appellants. Reynolds and Liggett required their retailers to price the 10-cent brands at a differential of not more than three cents with the so-called standard brands of appellants, and insisted upon such dealers correcting a greater differential by increasing the retail price of the 10-cent brands to 11 cents—with appellants' brands selling at 14 cents a package—or, alternatively, by requiring that appellants' brands be priced at 13 cents, with the lower-priced cigarettes selling at 10 cents a package. Salesmen for Liggett were instructed to do what they could to narrow the differential in question to three cents, it being deemed of no consequence whether the dealer raised the price of the 10-cent brands or reduced the price of Liggett's brand. Reynolds referred to a differential of more than three cents as "discriminatory," because the dealer would then make a higher gross profit on its cigarettes than on the 10-cent brands, and, accordingly, wrote dealers that "our customers are not justified in making a larger percentage of profit on our brands than they make on other brands of tobacco manufacturers, taking into consideration list prices of all brands." Liggett, admittedly, refused to tolerate a differential in prices either for or against its brand, and will not permit a dealer to sell Chesterfields at a price lower than Camels or Lucky Strikes. It demands that its jobbers and retailers sell its products at exactly the same price as those of other appellants; makes its list price the same as those of the other two companies; and prohibits the members of its organization from seeking a price advantage, or allowing it if they can prevent it.

American's representatives, in communications to their company, commonly refer to the fact that certain dealers, who have unconsciously violated the wishes of the company, did not realize the importance of selling the brands of appellants at the same price. There is also evidence that representatives of American tried to discourage dealers from selling the 10-cent brands, telling them that they were making a mistake in selling such cigarettes, since the profit was so small; that, on various occasions, American attempted to get retailers and wholesalers to reduce prices on its brands to 12 cents per package and, in special circumstances, to 11 cents per package, and, of course, as above mentioned, prepared posters announcing a price of 10

cents a package, at which numerous pricecutters actually sold them. Moreover, American insists that, when the retail prices of the brands of the other two appellant companies are reduced, the retail price of American also be reduced to the identical amount; and its president suggests to officials of a subsidiary that, since a distributor assumes the responsibility of preventing differentials in price from creeping in, such distributors should sell to sub-jobbers, at no profit whatever, if necessary, to avoid such a situation. It is conceded that when one appellant campaigns among dealers to break the prices of its cigarettes, and succeeds, the others know that the prices on their brands will likewise be broken.

On the trial, the president of American testified that he made the two drastic cuts, not because of the 10-cent brands, but in spite of them, implying that the sales of the cheaper cigarettes were of no consequence or concern to his company. This lack of interest in the 10-cent brands, however, was not evident on the part of the vice president and the other representatives of American in the field, who, subsequent to the list price reductions, manifested an intense preoccupation with the rapidly dwindling sales of the cheaper cigarettes, and were keeping their company informed on the developing situation, reporting that the lower prices on the "15-cent brands" were causing a rapid decrease in the sales of the 10-cent brands, and that the latter were falling off 75% in volume, as a result of the cuts.

After the list price reductions were made, appellant companies commenced the distribution of posters in numerous places, advertising their brands at 10 cents a package, and were making attempts to have dealers meet these prices. There is evidence that among the efforts used to achieve their desired objectives, appellants gave dealers direct-list privileges of purchase, together with discounts, posters, advertising displays, cash subsidies, and free goods. In addition to the use of these inducements, appellants also, as seemed expedient, used threats and penalties to enforce compliance with their retail price program—removing dealers from the direct lists, canceling arrangements for window advertising, changing credit terms, with resulting hardship to recalcitrant dealers, discontinuing cash allowances for advertising, refusing deals giving free goods, and making use of price-cutters, to whom they

granted advantageous privileges to drive down retail prices in cases where a parity, or price equalization, was not maintained by dealers between appellants' brands—or where the dealers refused to maintain the three-cent differential between the 10-cent brands and appellants' cigarettes.

Further, in support of its claim that appellants combined and conspired in violation of the statute, the Government introduced evidence that representatives of Reynolds and Liggett acted together at various times in causing price-cutters to be placed on the direct list in order to depress prices in certain areas; that on a certain occasion, representatives of the three appellant companies met with representatives of dealers, jobbers, and other cigarette companies, and participated in a demand that the 10-cent brands be raised to 11 cents a package, or that appellants' brands be reduced to 13 cents a package; and that, as a result, the price of the 10-cent brands was raised to 11 cents a package, over the protests of representatives of the manufacturers of the 10-cent brands, who were present at the meeting.

Among other circumstances which justify inferences of collusion is the fact that prior to appellants' announcement of a cut in their list prices on February 11, 1933, the Great Atlantic & Pacific Tea Company, on February 10th, sent out, by night letter, instructions to its 15,000 stores to put a price of 10 cents per package on the leading brands of the three companies, effective February 11th. In addition, the A & P Company had instructed its divisions to make up price posters in advance of the price reductions and, allegedly, before it had notice thereof from appellants, or any of them. In this connection, it appears that in the three-year period preceding the price cut in question, appellants had paid the A & P Company a total of more than $1,800,000 for window and counter displays and sales cooperation. Of this amount, Reynolds had paid more than $550,000; Liggett, more than $525,000; and American, more than $787,000. In 1933, the A & P Company received from the three appellant companies, $716,551.96; and it had been used by them as a price-cutting instrumentality on prior occasions. It is inconceivable, says the Government, that the A & P Company had not been notified by appellants of the coming reduction in list prices; and that, under all of the circumstances, taking into consideration the vast business dealings and relationships between the companies, it is absurd to believe that it would act independently, merely on vague and unconfirmed rumors (as claimed by the A & P Company), and sell appellants' cigarettes below cost, in its thousands of stores, even for a day. The only reasonable inference to be drawn, according to the Government, is that the list price slash was the result of a combination and conspiracy, participated in by all three appellant companies, and that the A & P Company had been given prior secret information of the exact date and the exact amount of the price reductions.

Furthermore, it appears that when dealers receive an announcement of a price increase from one of the appellants, and attempt to purchase brands of the others, at their unchanged price before announcement of similar changes, the other two refuse to fill such orders. As far as the jobbers or dealers are concerned, it therefore makes no difference which of the companies is first to announce the price change. By suspending the sales in the interim, the same result is achieved as if they had all announced the change at the same moment; and no price competition is permitted to exist between the time that one company announces an increase and the others follow with a similar action.

From the evidence, it is contended, the jury drew the only inferences to be reasonably drawn, that the appellants combined, agreed and conspired to restrain trade and to monopolize—and did monopolize—in violation of the Sherman Act.

Having outlined sufficient of the evidence for the purpose of our determination, and noted a number of the inferences, which the Government contends were properly drawn by the jury, we come to the discussion of appellants' claim that there was no proof of any actual agreement, combination, or conspiracy in restraint of trade.

At the outset, it may be remarked that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it. United States v. Pullman Co., D. C., 50 F.Supp. 123. It is

not essential that the various agreements, combinations, and transactions shown by the evidence—considered singly—be unlawful as in restraint of trade. So considered, they may be entirely innocent; but acts absolutely lawful in themselves may be steps in a criminal conspiracy. Aikens v. Wisconsin, 195 U.S. 194, 206, 25 S.Ct. 3, 49 L. Ed. 154; and a series of agreements, if the result of a concerted plan or plot between two or more parties to secure thereby control of the sale of a commodity in the markets of various states, and thereby suppress competition, come plainly within the terms of the statute and, as a part of the scheme or plot, are unlawful. United States v. Reading Co., 226 U.S. 324, 357, 33 S.Ct. 90, 57 L.Ed. 243. Where the several acts charged are lawful, nevertheless, if bound together as parts of a single plan, the plan may make the parts unlawful. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518. Thus, a contract may not be inherently illegal, but if part of a general scheme of monopoly, it falls within the condemnation of the statute. United States v. Corn Products Refining Co., D.C.N.Y., 234 F. 964, 979. The Sherman Act condemns every means, no matter how novel, to accomplish the objective of carrying out a conspiracy to restrain or monopolize trade. It is not the form of the combination, or the particular means used, but the result to be achieved that the statute condemns, and it is of no importance whether the means used to accomplish the unlawful objective are, in themselves, lawful or unlawful. Acts done to give effect to the conspiracy may be, in themselves, wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. United States v. New York Great Atlantic & Pacific Tea Co., 5 Cir., 137 F.2d 459, 464. So an act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual against whom the concerted action is directed. Grenada Lumber Co. v. Mississippi, 217 U.S. 433, 440, 441, 30 S.Ct. 535, 54 L.Ed. 826.

With these observations as to the necessity of considering the evidence concerning the combination, agreement, and conspiracy as a whole, rather than viewing each particle separately, we come to the question of the rule as to sufficiency of proof, in this case, of the alleged agreement and combination.

▮ No formal agreement is necessary to constitute an unlawful conspiracy. Almost always, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. Stack et al. v. United States, 9 Cir., 27 F.2d 16; Pearlman v. United States, 9 Cir., 20 F.2d 113. The agreement may be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose. Marino v. United States, 9 Cir., 91 F.2d 691, 113 A.L.R. 975. It is the common design which is the essence of the conspiracy or combination; and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but always leading to the same unlawful result. United States v. Harrison, 3 Cir., 121 F.2d 930; Allen v. United States, 7 Cir., 4 F.2d 688. Often, if not generally, direct proof of a criminal conspiracy is not available, and the common purpose and plan are disclosed only by a development and collocation of circumstances. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Manton, 2 Cir., 107 F.2d 834; and it is settled that the essential agreement, combination, and conspiracy in violation of the Sherman Act may be implied from, or found in a course of dealing or other circumstances, as well as through an exchange of words. United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S. Ct. 251, 64 L.Ed. 471; United States v. Pullman Co., supra, 50 F.Supp. 123, at page 134. Where the circumstances are such as to warrant the jury in finding that the conspirators had some unity of purpose, or some common design and undertaking, or some meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established, is justified. See Marx v. United States, 8 Cir., 86 F.2d 245, 250; Shannabarger v. United States, 8 Cir., 99 F.2d 957.

From the foregoing, it therefore remains to ascertain, a little later on, whether from the evidence, the reasonable inferences drawn therefrom sustained the conclusion that appellants acted in concert and collusion with the objectives charged by

the Government. However, in considering the argument of appellants, that there was no proof of any combination, agreement, and conspiracy, we find that this contention is, to a large extent, enmeshed with their claim that there was insufficient evidence to sustain the convictions for violation of either Section 1 or 2 of the Sherman Act—relating to agreements or combinations in restrain of trade, and to monopoly.

Having considered appellants' claim with regard to the requisite proof of the conspiracy and combination, and the authorities applicable thereto, we next address ourselves to the question of the sufficiency of the evidence of violation of the statute, and, accordingly, turn first to the appellants' contention, with reference to Section 1 of the Sherman Act, wherein it is provided that a person who makes any contract or engages in any combination or conspiracy in restraint of trade or commerce among the several states, is guilty of violation of the statute. 15 U.S.C.A. § 1.

While there are various ways of restraining trade and commerce in contravention of the anti-trust laws, one of the most common types of violation is concerned with maintaining prices, as charged in this case. Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition. United States v. Trenton Potteries, Inc., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989. And agreements which create potential power for such price maintenance, exhibited by its actual exertion for that purpose, are in themselves unlawful restraints within the meaning of the Sherman Act. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. An agreement to pay or charge rigid, uniform prices is illegal. Price-fixing includes not only the estab-

lishment of uniform prices, but also an agreement upon a range within which purchases or sales will be made. Prices paid or charged are fixed if they are to be at a certain level, or on ascending or descending scales, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

Restrictions imposed by the seller upon resale prices of articles moving in interstate commerce were, until the enactment of the Miller-Tydings Act, 50 Stat. 693, 15 U.S.C.A. § 1 (which is not here involved), consistently held to be a violation of the Sherman Act.[3] Ethyl Gasoline Corp. v. United States, supra. "A distributor of a trade-marked article may not lawfully limit by agreement, express or implied, the price at which or the persons to whom its purchaser may resell, except as the seller moves along the route which is marked by the Miller-Tydings Act." United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 721, 64 S.Ct. 805, 812.

Equivalent to the above-mentioned unlawful resale agreements—as illegal conduct prohibited by the anti-trust law—are, also, systems of operations constituting schemes which restrain interstate commerce. Illustrative of the attitude of the courts toward this latter situation, is the case of Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882, where it was said that, although a trader is not guilty of violating the Sherman Act simply by refusing to sell to others, and while he may withhold his goods from those who will not sell them at the prices which he fixes for their resale, he may not, consistently with the Act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade. In the foregoing case, it was held that where freedom of competition is

---

[3] See Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 503; United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; United States v. A. Schrader's Son, Inc., D.C., 264 F. 175, reversed in United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Frey & Son, Inc., v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 461,

65 L.Ed. 892; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Hills Bros. v. Federal Trade Commission, 9 Cir., 9 F.2d 481; American Tobacco Co. v. Federal Trade Commission, 2 Cir., 9 F.2d 570; Toledo Pipe-Threading Mach. Co. v. Federal Trade Commission, 6 Cir., 11 F.2d 337.

suppressed by methods of constraint or threat, in which a seller secures the cooperation of its distributors and customers—and which are quite as effectual as agreements expressed or implied, intended to accomplish the same purpose—such methods violate the Sherman Act, regardless of the conclusions of a fact-finding body that such merchandising conduct did not constitute agreements for maintenance of resale prices.

Whether the activity of any of the appellants in their efforts to maintain retail prices—apart from any question of combination among themselves—was a violation of the Sherman Act, we will remark upon hereafter, in connection with our determination as to whether the evidence sustains the charge that, in maintaining prices, appellants acted in combination, agreement, and conspiracy, contrary to the anti-trust law. At this point, however, we proceed to the discussion of the propositions of law which the issue of monopoly projects into the controversy.

Appellants' argument, with regard to the insufficiency of proof of violation of Section 2 of the Sherman Act, will be necessarily considered in connection with their claim that the trial court erred in those instructions to the jury in which it defined "monopoly." For it is apparent that a discussion of the elements of proof which are necessary to sustain a charge of monopoly under the Sherman Act, would be unintelligible unless it were known or ascertained of what monopoly, under the statute, consists.

Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

The district court charged the jury, in connection with the counts under Section 2 of the statute—monopolization, attempt to monopolize, and conspiracy to monopolize—as follows: "Now, the term 'monopolize' as used in Section 2 of the Sherman Act, as well as in the last three counts of the Information, means the joint acquisition or maintenance by the members of a conspiracy formed for that purpose, of the power to control and dominate interstate trade and commerce in a commodity to such an

extent that they are able, as a group, to exclude actual or potential competitors from the field, accompanied with the intention and purpose to exercise such power."

Appellants make varying contentions to the effect that the foregoing instructions were erroneous. American insists that an essential element of the offense of monopoly is the exclusion of actual or potential competitors from the field, and that the mere possession, on the part of a person or corporation, of an unexerted power to control, is not an offense. Reynolds contends that, in order to sustain a violation of the monopoly count of the statute, the Government must prove: actual exclusion by wrongful means, of all, or substantially all, competition, and the consequent acquisition or maintenance of domination or control over the field of the business in question; or, the employment of wrongful means, pursuant to agreement, of a character calculated to exclude competition to such an extent as to create a dangerous probability that monopoly will result; or, that there was an agreement between members of a combination to take wrongful action to exclude competition in order to obtain a monopoly. Liggett & Myers argues that, in order to sustain the judgment of the district court in this case, the Government must prove: that appellants intended to monopolize commerce in leaf tobacco and tobacco products; and, that they had the power to carry out this intention. This is, in effect, what the court actually charged. However, at the conclusion of its argument on this point, the above-named appellant insisted that evidence of intent and power is not enough, but that there must be evidence of wrongful action calculated to exclude—that is, actual use of methods, contrary to the public policy as expressed in the statute or in the common law, to exclude; or, as otherwise stated, "affirmative exercise of the power to exclude."

With regard to the contention that it is necessary to prove an exertion of the power of exclusion and the exclusion of actual competitors by wrongful means, in order to sustain a charge of monopolizing, appellants rely largely upon Patterson v. United States, 6 Cir., 222 F. 599, 618, in which it was said that the root idea of the word "monopolize," is "to exclude," and that to monopolize trade or commerce is to exclude persons therefrom.

In the Patterson case, insofar as here applicable, the question was whether the defendants were guilty of monopolizing *"by wrongful means,"* [4]—"whether the making by one competitor of an interstate sale or interstate sales of a commodity by the use of wrongful means which, but for the use thereof, another competitor or other competitors would have made, constitutes monopolizing * * * by such competitor within the meaning of the Second Section." The court said that there could be no monopolizing in making a single interstate sale or making a great number of such sales, even though wrongful means were used in making them, but that for one competitor to exclude all, or substantially all, other competitors from the free opportunity of approaching each and every prospective purchaser on equal terms, with a chance of making a sale—that is, to drive them from the field of freely offering their goods, so as to have that field for himself—was to monopolize.

In developing its views and arriving at its determination that there could be no monopolization by the use of the wrongful means alleged in the Patterson case, unless there had been exclusion of competitors, the court emphasized the element of exclusion in monopoly generally, and proceeded to discuss types of monopolizing by a combination of competitors. Such a combination, however, was not before the court, there having been no proof or allegation to this effect in the case under consideration. The discussion, referred to, embodies general expressions and a consideration of principles serving to illustrate the point in controversy, and it is a maxim not to be disregarded, that general expressions in every opinion, are to be taken in connection with the case in which those expressions are used. The Patterson case is not to be taken as authority for the rule that in order to sustain a charge of monopolization, there must, in all cases, be proof of exclusion or attempted exclusion of actual or potential competitors.

■ While a combination which effectively excludes or tries to exclude outsiders from a business altogether, is a monopoly or an incipient monopoly, and is unconditionally unlawful, such action does not exhaust the types of conduct banned as monopolizing by the Sherman Act. Other action falls into categories equally forbidden as monopolizing under the statute. United States v. Associated Press, D.C., S.D.N.Y., 52 F. Supp. 362, 369; Fashion Originators Guild v. Trade Commission, 312 U.S. 457, 466, 61 S.Ct. 703, 85 L.Ed. 949; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434. See also, Hood Rubber Co. v. United States Rubber Co., D.C.Mass., 229 F. 583; United States v. American Tobacco Co., D.C., 164 F. 700, 721; Burrows v. Interborough Metropolitan Co., C.C.N.Y., 156 F. 389; Attorney General v. National Cash Register Co., 182 Mich. 99, 148 N.W. 420, Ann.Cas.1916D, 638; Richardson v. Buhl, 77 Mich. 632, 638, 43 N.W. 1102, 6 L.R.A. 457.

■ Before proceeding further, comment should be made upon the argument on the part of appellants, relative to actual exertion of the power of exclusion. It is asserted that the mere possession of unexerted power is not an offense under the monopoly section of the Sherman Act, and in support of their contention, appellants cite United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121, and United States v. International Harvester Co., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302. It is true that, as an abstract proposition—in many cases—the unexerted power to control does not offend against the statute. This is so where such power is acquired by natural growth, legitimate competition, or by other legal means. Mere size or existence of unexerted power is not an offense, as said in the Steel Corporation case 251 U.S. 417, at page 451, 40 S.Ct. 293, 64 L.Ed. 343, 71 L. Ed. 1302. But neither this statement of the law, nor the Steel Corporation and Harvester Company cases, relied upon by appellants, are here applicable. For the fact that power to control is unexerted, is not the governing consideration, where such power to control and dominate has been jointly acquired by members of a conspiracy formed for such purpose, with the intention and purpose of exercising the power. This distinction was indicated in the opinion in Apex Hosiery Co. v. Leader, supra, where in the footnote 310 U.S. 469 at page 496, 60 S.Ct. 982, at page 994, 84 L.Ed. 1311, 128 A.L.R. 1044, it was pointed out that, in

---

[4] For the enumeration of such means, see Patterson v. United States, supra, 222 F. at pages 612, 613.

the Steel Corporation case, the majority of the court was of the opinion that the combination was not shown to have ever possessed or exerted sufficient power, when acting alone, to control prices of the products of the industry; and that in the Harvester Company case, the belief that competitive conditions in the trade in harvesting machines had been established, compelled the court to find compliance with an earlier consent decree. It was further noted that in United States v. Reading Co., 253 U.S. 26, 47, 48, 40 S.Ct. 425, 64 L.Ed. 760, where the court found a power to control output, supply of the market, and transportation facilities of potential competitors in the anthracite coal market, the arrangement therefor was held void. From what has been said, the conclusion follows that proof of exertion of the power to exclude, and exclusion of an actual or potential competitor, is not essential to sustain a charge of monopolizing under the Sherman Act.

The foregoing discussion brings us to the consideration of what monopolization, under the statute, may consist; and in appraising the determining factors, we shall review certain of the cases dealing with, or discussing, the monopoly section of the statute.

What the provisions of Section 2 of the Sherman Act strike at, are combinations, contracts, and conspiracies to monopolize trade and commerce among the several states. United States v. E. C. Knight Co., 156 U.S. 1, 17, 15 S.Ct. 249, 39 L.Ed. 325. It is the scope of such combinations and their power to suppress or stifle competition or create monopoly, which determine the applicability of the act. United States v. Union Pacific R. Co., 226 U.S. 61, 88, 33 S.Ct. 53, 57 L.Ed. 124. The words "to monopolize" and "monopolize," as used in the section, reach every act bringing about the prohibited results. Standard Oil Co. v. United States, 221 U.S. 1, 31 S. Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734. And an agreement between corporations, whereby competition among them, in the manufacture, distribution, and sale of commodities entering into interstate commerce is avoided, is a violation of the monopoly section of the Sherman Act. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. In a charge of conspiracy to monopolize, no act other than the act of conspiring is required to be proved, for the reason that the Sherman Act punishes conspiracies at which it is aimed, on the common law footing. Nash v. United States, 229 U.S. 373, 376, 378, 33 S.Ct. 780, 57 L.Ed. 1232.

Under the statute, any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce, is illegal. Northern Securities Co. v. United States, 193 U.S. 197, 337, 24 S.Ct. 436, 48 L.Ed. 679. Contracts and combinations are within the Act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interest by unduly restricting competition or unduly obstructing the course of trade. Nash v. United States, supra. *Regardless of the use made of it,* a power resulting, not from normal expansion and legitimate business enterprise, but from deliberately calculated purchase for control, which enables a holding company to dominate two great competing interstate railroad carriers and two great competing coal companies engaged extensively in mining and selling anthracite coal that must be distributed over those railways, is *without more,* a menace to, and an undue restraint upon, interstate commerce within the meaning of the Anti-Trust Act, and is in flagrant violation of the prohibition against monopoly in the second section of that Act. United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760. See also, United States v. New England Fish Exchange, D.C.Mass., 258 F. 732; Lynch v. Magnavox Co., 9 Cir., 94 F.2d 883; Montrose Lumber Co. v. United States, 10 Cir., 124 F.2d 573.

In Northern Securities Co. v. United States, supra, in referring to the holding company device there in issue, the court said that the mere existence of such a combination and the power acquired by the holding company as its trustee, constituted a menace to, and a direct restraint upon, that freedom of commerce which Congress intended to recognize and protect, and which the public is entitled to have protected. See also, Harriman v. Northern Securities Co., 197 U.S. 244, 291, 25 S.Ct. 493, 49 L.Ed. 439. In United States v. Standard Oil Co., C.C.Mo., 173 F. 177, it was held that a stock transfer and trust transaction constituted a combination and conspiracy to monopolize in violation of Section 2 of the Sherman Act, and that agreements of competitive manufacturers and traders not to compete in the purchase or

sale of articles in interstate commerce, were illegal under the anti-trust law. A combination may be one in restraint of interstate trade and commerce, or to monopolize a part of such trade or commerce in violation of the Sherman Act, although such restraint or monopoly may not have been attempted to any harmful extent, but is potential only. United States v. International Harvester Co., D.C., 214 F. 987. The authorities hold that the material consideration, in determining whether a monopoly exists, is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so. United States v. American Tobacco Co., D.C., 164 F. 700, 721. See also, United States v. Union Pacific R. Co., 226 U.S. 61, 85, 33 S. Ct. 53, 57 L.Ed. 124; United States v. Reading Co., 226 U.S. 324, 370, 33 S.Ct. 90, 57 L.Ed. 243; United States v. Reading Co., C.C.Pa., 183 F. 427, 456. "It is undoubtedly true * * * that trade and commerce are 'monopolized' within the meaning of the federal statute, when as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient." United States v. Patten, C.C.N.Y., 187 F. 664, 672. See also, footnote in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, 60 S.Ct. 811, 84 L.Ed. 1129.

From the foregoing, in our opinion, the conclusion reasonably follows that acquisition of the power to accomplish the desired objective of monopoly, with intent so to do, is monopolization under Section 2 of the Act. It is not necessary to prove that the power has been exerted, and while monopolizing may manifest itself in various ways, the acquisition of such power to control, with that intent, is sufficient to constitute the offense under the anti-trust law. The trial court did not err in its instructions to the jury on the question of monopolization.

From the determination that the court properly charged on the monopoly feature of the case, we come to our conclusions with regard to the sufficiency of proof of conspiracy and of violation of the pertinent provisions of the anti-trust statute.

In appeals from judgments entered on jury verdicts, the sole function of this court, insofar as the evidence is concerned, is to determine whether there is substantial evidence to support the verdict. Of course, if the evidence is as consistent with innocence as with guilt, no conviction could properly be had.

Inferences which may reasonably be drawn from the evidence as a whole, must not only be consistent with guilt, but inconsistent with every reasonable hypothesis of innocence. But a "defendant has not necessarily established a case for a directed verdict in his favor by professing innocence and denying the existence of criminal intent. If the established facts and inescapable inferences are inconsistent with the accused's professions of innocence, it becomes the problem of the jury to weigh the evidence and determine, under proper instructions dealing with quantum of proof necessary to convict, the guilt or innocence of the accused. * * * Only by weighing the acts of the accused against his professions of innocence when they are inconsistent, can the fact finding body reach an intelligent verdict or finding. If the accused's acts and assurances are reconcilable, then no jury question is presented and the defendant should be dismissed. If, however, * * * the acts of the accused dispute his assurances of innocence and the conflict is vital, then the court must let the jury weigh the conflicting evidence and decide." United States v. Morley, 7 Cir., 99 F.2d 683, 685, certiorari denied 306 U.S. 631, 59 S.Ct. 463, 83 L.Ed. 1033. It is sufficient to sustain a conviction on a charge of conspiracy if, on consideration of all of the evidence, the jury is satisfied beyond a reasonable doubt of the guilt of the accused. As in all cases requiring proof by circumstantial evidence, the conclusion of guilt must follow beyond reasonable doubt from the facts and circumstances proved; but where there is substantial evidence to support every essential ingredient of the crime charged, the question is for the jury. Rosengarten v. United States, 6 Cir., 32 F.2d 644, 645.

Upon a consideration of the proofs in the case, and an application thereto of the appropriate legal principles previously discussed, we are of the opinion that the verdict was clearly sustained by the evidence. From all of the many circumstances disclosed on the trial, the jury was clearly justified in drawing inferences from which it could find, beyond a reasonable doubt, that appellants had combined, agreed, conspired, and acted in concert in

violation of Sections 1 and 2 of the Sherman Act. In arriving at this determination it is unnecessary to segregate and rehearse the heretofore recited portions of the evidence, in juxtaposition with each pertinent application of the law.

The identical objectives, the opportunity for communication between appellants in formulating policies for their mutual benefit, their concert of action in other matters in which they were mutually interested, their refusal to participate in buying at the markets unless all three appellant companies were present, the uniformity of list prices of their manufactured products, the identical and (for all practical purposes) simultaneous price increases and price reductions, their insistence on identical list prices, the similar rewards and punishments meted out to dealers by all the appellants in carrying out the same objectives, their policies which, in practice, resulted in their refusal to compete with each other in the field of prices, either in the purchase of leaf tobacco or in the sales of their finished products, are all circumstances—together with evidence of the use of many other methods earlier enumerated herein—from which an agreement on the part of appellants to act in concert, to the extent and in the manner outlined by the court, could be inferred by the jury beyond a reasonable doubt.

It is said by appellants that the court is not here concerned with resale price agreements imposed by a manufacturer upon a dealer, but only with such agreements imposed by a group acting in combination and agreement. Apart from any question of combination, the practices of appellants, as alleged by the Government, would be illegal. Spies pretending to be regular customers, were sent out by appellant companies to check among various dealers as to the retail prices at which they were selling. Those selling at any differential between the three standard brands, were interviewed by a representative of the company whose brand was priced at a higher figure than the others. If the dealers refused to lower the price, retaliatory measures were applied. Some dealers remained obdurate for months, defying certain of the appellants in bitter terms of castigation for attempting to interfere in, and control, their retail business. But most of such dealers felt the business necessity of carrying the brands in question and finally surrendered to the demands of the various appellant companies on all the retail price policies in controversy. The use of such methods and compulsions, brings the conduct of appellants, acting separately, within the rule announced in the Beech-Nut case with respect to restraint of trade. Moreover, the conduct of any one of appellants, considered apart from a combination among all or any of them, is evidence of an intent to monopolize. "The devising of means for * * * fixing sales prices, or adopting regulations for governing dealers, to be enforced by special rewards or penalties, inevitably result in concentration of business in the hands of a few, and may also result in giving to a single person or corporation such a unification of interest or management as to constitute an illegal monopoly. * * * the arbitrary enforcement of the restrictive conditions by the establishment of a system of espionage, and the keeping of records of violations of such conditions, with a view of penalizing such dealers, are evidence of an intention to promote a monopoly." United States v. Eastman Kodak Co., D.C., 226 F. 62, 77, 78. Use of the methods above mentioned, on the part of appellants, together with the other evidence in the case, justifies inferences that they had, jointly and under a common plan, tampered with, manipulated, and controlled prices in the sale of their manufactured products. Enough of the evidence has been recited with reference to the purchase of leaf tobacco to indicate that the same inferences were justified in that regard also.

Each of the appellants justifies its interference with retail prices on the ground that it is unfair discrimination for a dealer to sell its cigarettes at a higher price than that of the others, inasmuch as all of the brands in question are sold by appellants to the dealers at the same list price. But such list prices, upon which the whole price policy of appellants is based, are entirely arbitrary and are justified on no economic ground. The fact is that the appellant companies do not, and will not, compete in the price field. We see no justification for charges, based on list price identity, of unfairness and discrimination against dealers who wish to vary the retail prices of the cigarettes purchased, according to local circumstances and their own business judgment.

■ All appellants give the same reason for being obliged to follow a price rise inaugurated by any one of them—that if they do not follow it, the others will have more money to spend on advertising. But all of them also explain that they must similarly follow a price cut or will lose business through sales, as otherwise the cheaper priced cigarettes would completely outsell their products. These explanations are patently inconsistent. Of course, it is not necessary, as suggested, that appellants give any explanation of their conduct. But whether they do or not, it would be contrary to common sense to say that the jury could not draw inferences, from the price changes and appellants' methods therein, that they all conspired and agreed to raise or lower their prices simultaneously, and that they acted in combination, agreement, and concert in so doing. In this regard, appellants refer to the fact that it is not unlawful to follow price leadership. But, in answer to this argument, it may be remarked that "uniformity of price may be the result of agreement or understanding, and that an artificial price level not related to the supply and demand of a given commodity may be evidence from which such agreement or understanding, or some concerted action of sellers operating to restrain commerce, may be inferred." Cement Manufacturers Ass'n v. United States, 268 U.S. 588, 606, 45 S.Ct. 586, 592, 69 L.Ed. 1104. The explanation given why all appellants must be represented at the same markets—and their refusal to purchase at a market where they are not all present—is that if one is absent from, or quits a market, the competitors would buy tobacco at a much lower price than the other had bought it, and that, for that reason, they try to adjust the amount of tobacco they buy so that the three appellant companies are represented on all markets from the beginning to the end of the selling season. They assert that they carry out this policy in pursuance of a duty which they feel they owe to the grower to give to the man selling last the benefit of whatever purchasing power the companies may have, in equal proportion to the man selling first. These explanations of appellants' conduct as being necessary to enable all the farmers to get the best prices and, at the same time, to prevent any one of the companies from buying tobacco at prices disadvantageous to the farmers—even if meritorious in fact—could not justify the fixing or stabilizing of prices by joint understanding. See United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 291, 46 L.R.A. 122.

■■ Appellants assert, also, that the fact that the manufacturers of the 10-cent brands of cigarettes have continued to be successful, shows that the charge that appellants have been guilty of monopolistic practices and monopolization are inconsistent, incongruous, and shown to be fallacious by such proofs. But in United States v. American Tobacco Co., D.C., 164 F. 700, 702, 703, it appeared that during the existence of the Tobacco Company in that case, new enterprises had been started, some with small capital, in competition with it, and had thrived; and that the price of leaf tobacco had steadily increased. But it was held that these circumstances were immaterial in considering the charge that the defendant had been guilty of monopolizing. It is repeatedly emphasized by appellants, that the mere size and wealth of a business is not evidence of violation of the statute. However, it is to be observed that size affords an opportunity for abuse of the power which exists by reason thereof, and that this factor is not to be ignored where it appears that, in the past, the opportunity has been utilized. Size may be considered in connection with other evidence bearing upon the alleged monopolistic practices. See United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; United States v. Eastman Kodak Co., D.C. N.Y., 226 F. 62, appeal dismissed 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795. In United States v. International Harvester Co., D.C., 214 F. 987, 1000, it was, significantly—and with special pertinence to the case before us—said: "There is no limit under the American law to which a business may not independently grow, and even a combination of two or more businesses, if it does not unreasonably restrain trade, is not illegal; but it is the combination which unreasonably restrains trade that is illegal, and if the parties in controversy have 80 or 85 per cent. of the American business, and *by the combination of the companies all competition is eliminated between the constituent parts of the combination*, then it is in restraint of trade within the meaning of the statute, under all of the decisions." (Italics supplied.)

■ Payments made to dealers for purposes of advertising appellants' products are, it is argued, not evil or illegal.

But such payments, in this case, certainly constituted evidence from which the jury could draw inferences that they had been given by appellants to dealers to affect particular price situations, and to carry out a price conspiracy. The same could be said of the use of free goods, direct list privileges, and other advantages given to dealers by appellants. In considering the arguments of certain of the appellants, it may be assumed that, for instance, Liggett & Myers did not remove dealers from its direct list to enforce acquiescence in its retail price program, or that American did not require its dealers to maintain a three-cent differential with the 10-cent brands. In the case of Liggett, there was evidence, however, from which the jury could infer that, if such an extreme measure as removal from the direct list was not adopted, nevertheless, other methods of inducement, resulting in advantage or disadvantage to the dealers, were used. As to American, due to its insistence that its retail prices should not be higher than those of the other two appellants, it received as much benefit from their conduct in enforcing the three-cent differential, as they themselves did. If appellants conspired and acted pursuant to agreement and understanding—even though tacit—the action of any of them to restrain or monopolize trade for the benefit of all of them, is, in law, the action of all.

■■■■ We have considered, to some extent, the contentions of the appellants, their explanations, and the controverted evidence, but "This court is not charged with the duty of considering conflicts in the evidence, credibility of witnesses, the plausibility of explanations offered by defendants, or the weight of the evidence. Its sole function in this regard is to determine whether there is substantial evidence to support the verdict. * * * The jury having found the defendants guilty, that view of the evidence and the inferences reasonably to be drawn therefrom must be taken which is most favorable to the government." Galatas v. United States, 8 Cir., 80 F.2d 15, 23. There was substantial evidence to enable the jury to draw inferences that appellants had, beyond a reasonable doubt, violated Sections 1 and 2 of the Sherman Act.

■■■■ We pass to appellants' claim that the trial court erred in its statements to the jury when, after it had been charged at the conclusion of the arguments, it re-turned with a request for further instructions. At that time, the foreman told the court that the jury was confused as to whether count one and count four were separate offenses. The court then informed the jury that these counts charged separate offenses and that the jury might find a verdict of guilty on one count, or both, or on one and not the other. Appellants contend that the jury was thus enabled to find appellants guilty, under count one, of conspiracy to restrain trade by price-fixing; and guilty, under count four, of conspiracy to monopolize by some means other than price-fixing—and that, since no such other means were alleged or proved, a verdict on count four was reversible error.

The basis for appellants' assertion that the effect of the instructions was to tell the jury that it could find appellants guilty of conspiracy to monopolize by means other than price-fixing, is that it would be clearly inconsistent to find (as the court charged the jury it could find) that the appellants were guilty of conspiracy to monopolize by price-fixing, and yet, under the same allegations of fact, to find them not guilty of conspiracy to restrain trade by price-fixing; and that, therefore, appellants, if innocent of a price-fixing conspiracy to restrain trade, could only be guilty of a conspiracy to monopolize by some means other than price-fixing. But the circumstance that there might be perceived an inconsistency in a possible finding of guilt on the charge of conspiring to monopolize by price-fixing, and a verdict of not guilty on a charge of conspiracy to restrain trade by the same means, would not vitiate the charge or the verdict. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Borum v. United States, 284 U.S. 596, 52 S.Ct. 205, 76 L.Ed. 513; Morgan v. United States, 8 Cir., 98 F.2d 473. See also, United States v. General Motors Corp., 7 Cir., 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497. It is to be observed also that the jury did find appellants guilty of conspiracy to restrain trade by price-fixing, as well as of conspiracy to monopolize by the same means, and, actually, its verdict was not inconsistent in any degree. Moreover, in answer to certain observations of appellants, it is to be remarked that what the trial court may have said to counsel in a colloquy after the jury had retired, is of no consequence on this review. We find no merit in appellants' complaint herein.

With regard to the claim of American that it was subjected to an unlawful search and seizure of its papers in violation of the Fourth Amendment, it appears that under subpoena duces tecum, returnable on the date on which the trial was scheduled to commence, appellants produced the writings designated therein, American delivering into the custody of the clerk, a large number of filing cases containing the documents called for by the subpoena. After the discussion of certain questions relating to jurors, appellants requested adjournment to make additional preparation for trial; and, after granting the postponement and before adjourning, the court proceeded with the matter of returns to the subpoenas. Reynolds and Liggett advised that arrangements had been worked out so that the documents produced by them would be available to the Government for inspection. American stated that no such rights would be granted by it.

The Government thereupon moved for leave to inspect, and the trial court rendered decision on the motion, permitting inspection, stating that, at the request of appellants, it would examine any documents which they claimed were irrelevant, privileged, or, for any reason, not subject to inspection, in order to determine whether inspection in such a case should be permitted. At the time of this determination, the documents in question had already been impounded. A motion was made to set aside the order of impoundment and to change the return date of the subpoenas to the later date to which the trial had been postponed. This was denied by the court. The documents had come into the possession and control of the court pursuant to valid subpoenas. The court permitted no general search of appellants' papers, but only an inspection of those within the specifications of the subpoenas. Appellants were able to have the court examine any documents which they considered privileged, beforehand, and if the court considered that they were not subject to examination, there could be no inspection. Since the documents were impounded and had come into the control of the court pursuant to, and in response to, valid subpoenas, appellants could not thereafter contend that the inspection permitted by the court constituted an unlawful search and seizure in violation of the Fourth Amendment. See Perlman v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950; Ex Parte Fuller, 262 U.S. 91, 43 S.Ct. 496, 67 L.Ed. 881; Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159.

Moreover, under the circumstances, the order permitting inspection was reasonable. The Fourth Amendment was not intended to interfere with the power of courts to compel, through a subpoena duces tecum, the production, upon a trial in court, of documentary evidence, so long as the scope of the subpoena is reasonable. United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805. The permission to inspect granted the Government did not constitute an unreasonable search and seizure in violation of the Fourth Amendment.

Referring to the contention that the inspection permitted by the court destroyed the constitutional safeguard against compulsory self-incrimination: "The Fifth Amendment does not protect a corporation against self-incrimination through compulsory production of its papers." United States v. Bausch & Lomb Optical Co., supra, 321 U.S. page 726, 64 S.Ct. page 815. "Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation." United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251. Here, too, it is to be remembered, if anything further were needed to justify the court's determination, that the evidence in question was already available for use by the prosecution on the trial.

The sentences on the different counts did not result in multiple punishment for the same offense, contrary to rights guaranteed by the Fifth Amendment, as contended by appellants. While Sections 1 and 2 of the Sherman Act forbid undue restraint of trade, they cover different matters. The crime defined by Section 1 is legally distinct from the crime defined by Section 2. Offenses under these sections are not identical even though all the evidence is applicable to a count under Section 1, as well as to a count under Section 2. Congress may provide that separate steps in a single transaction shall constitute separate offenses. If offenses are distinct in law they are not identical, regardless of how closely they are connected in point of fact. A single act may be an offense against two statutes. The test laid down by the adjudicated cases as to the identity of offenses under separate stat-

utory provisions, is, whether each statutory provision requires proof of a fact which the other does not. A conspiracy in restraint of trade, violative of the first section, is not identical with a conspiracy to monopolize trade, violative of the second. The three counts under Section 2 of the statute named three separate offenses; the act, the attempt, and the conspiracy to monopolize interstate commerce. The attempt, in this case, was held to be merged in the act. The offenses charged in the three counts upon which appellants were sentenced, were not identical in law, but were distinct and separate, and the sentences thereon were, accordingly, not erroneous. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 84 L.Ed. 1129; Montrose Lumber Co. v. United States, 10 Cir., 124 F.2d 573; United States v. Shapiro, 2 Cir., 103 F.2d 775; United States v. Buchalter, 2 Cir., 88 F.2d 625, certiorari denied Shapiro v. United States, 301 U.S. 708, 57 S.Ct. 942, 81 L. Ed. 1362; United States v. MacAndrews & Forbes Co., C.C.N.Y., 149 F. 836.

 As against the contention of appellants, we are of the opinion that the information alleged an agreement between the parties, and clearly possessed the requisite degree of particularity. It was set forth in various counts that appellants had unlawfully attempted to restrain competition and that their combination had been effectuated "by concerted action and pursuant to a common plan and understanding." Any words which fairly import a concerted action for a conniving together to restrain trade, are sufficient to charge a conspiracy. United States v. Armour & Co., 10 Cir., 137 F.2d 269. See also, United States v. M. Piowaty & Sons, D.C.Mass., 251 F. 375, 379. Since the alleged scheme covered a wide field, and the charge, numerous shifting elements, it was impossible to set forth all the facts specifically and definitely; and, in such a case, more than a general description of its nature being impossible, such a description is, accordingly, sufficient. Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L. Ed. 518; United States v. Patterson, D.C., 201 F. 697, 719; United States v. MacAndrews & Forbes Co., C.C., 149 F. 823, 830.

 Furthermore, it is our conclusion that the Fifth Amendment did not require an indictment in this case. Misdemeanors punishable by fine, or by fine and imprisonment not to exceed one year, as provided in Sections 1 and 2 of the Sherman Act, may be prosecuted by information. Falconi v. United States, 6 Cir., 280 F. 766. See Duke v. United States, 301 U.S. 492, 57 S. Ct. 835, 81 L.Ed. 1243; and the foregoing rule is not rendered nugatory by Title 18 U.S.C.A. § 753f, as contended. See United States v. Sloan, D.C.S.C., 31 F.Supp. 327.

 The trial court directed the use of alternate jurors in accordance with § 417a of Title 28 U.S.C.A., which provides therefor, under certain circumstances in trials of a "defendant against whom has been filed any indictment." No contention is made that the circumstances were not such as to warrant the use of alternate jurors; but it is claimed that, because the proceedings in this case were instituted by the filing of an information, their use was unauthorized and calls for reversal. The object of the statute was to prevent mistrials in criminal trials of long duration, where a juror dies or becomes so ill as to be unable to continue the performance of his duties. (H.R. 957, 72nd Cong. 1st Sess.) The purpose of the statute was remedial, and there is no logical basis, as far as this case is concerned, for distinguishing actions instituted by indictment and by information. In such a case, "indictment" should be given a generic construction, as any other would be inconsistent with the plain intention of Congress. See United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; Johnson v. Southern Pacific Co., 196 U.S. 1, 14, 25 S.Ct. 158, 49 L.Ed. 363; United States v. Borger, C.C.N.Y., 7 F. 193; In re Smith, C.C.Mass., 13 F. 25. Only 12 jurors—all properly qualified—participated in the deliberations, after having heard the evidence, arguments, and instructions of the court. The use of the alternate jurors was proper.

 The trial court did not err in ruling on the motion for bills of particulars, which were granted in part and denied in part. The Government furnished the additional information ordered by the court, and was not required to lay before appellants its entire case in all its details and ramifications. The granting or denying of demands for particulars is a matter within the discretion of the trial court and, unless there is an abuse thereof, its actions will not be disturbed. Appellants do not show that the court abused its discretion in refusing to compel the Government to

furnish the many items and detailed information demanded, and we find no such abuse of discretion. See Stumbo v. United States, 6 Cir., 90 F.2d 828.

■■■ Error is claimed on the refusal of the trial court to sustain challenges for cause to a juror who, obviously was unwilling to serve on the jury. On questioning by counsel, considerable uncertainty was expressed by the juror as to whether various circumstances might prejudice him, first, against the Government's case, and thereafter, with regard to the case of appellants. But, on several occasions, he said that he could decide the case on the law and the evidence and be fair to both sides, and finally stated to the court that he would not be influenced in any way, in rendering a verdict, by the possible outcome of the suit. His inconsequential interest in an acre of tobacco grown by his father, and his answers on the voir dire, presented to the trial court for determination the question whether his interest or partiality disqualified him. Such a question is decided by the trial court upon the evidence, and, unless there is manifest error in its finding, it will not be set aside on review. See Reynolds v. United States, 98 U.S. 145, 156, 157, 25 L.Ed. 244; Press Publishing Co. v. McDonald, 2 Cir., 73 F. 440, 443, certiorari denied 163 U.S. 700, 16 S.Ct. 1205, 41 L.Ed. 320; Hopt v. People, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708. We find no such error in the district court's determination. With regard to the claims of error for failure to sustain challenges for cause to three prospective jurors who, eventually, as a result of peremptory challenges, did not sit upon the jury, we have carefully examined the voir dire in the light of appellants' arguments and the trial court's questioning during the examination, and find the contentions that there was error in the court's ruling therein to be without merit.

■■■ Appellants claim that the court erred in admitting evidence of "bonuses" paid to certain officials of the various corporations. These payments depended on annual profits earned in excess of those which had been earned when the companies were operated as a unit prior to the dissolution decree in the Tobacco case, to which reference has been already made. We are of the opinion that this evidence was clearly admissible as bearing on the possible motive of such officials to act in combination, in accordance with an understanding—perhaps, tacit—for the purpose of financial gain. The court properly pointed out that proof of motive and opportunity alone fell far short of showing violation of law, but that any facts which reflected on motive, might be considered along with other testimony in the case. Error, asserted because of admission of evidence as to the salaries of officials, was cured when stricken by the court. See United States v. Maggio, 3 Cir., 126 F.2d 155, 159; Patterson v. United States, 5 Cir., 111 F.2d 641.

■■■ We find no error in the introduction in evidence of testimony and correspondence between a sales representative of one of the appellants and the company which employed him. It constituted admissions on the part of such appellant, and any act or declaration of a conspirator is admissible against all of them, whether or not they knew of the commission of the act or the making of the declaration. Brock v. Hudspeth, 10 Cir., 111 F.2d 447; United States v. Manton, 2 Cir., 107 F.2d 834; United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211. Nor was the evidence of admissions by one conspirator—including statements not based on personal knowledge—inadmissible as hearsay. Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462. At the time the evidence in question was introduced, there was already a prima facie showing of conspiracy, which is all that is necessary as a foundation for the introduction of evidence of acts and declarations of a conspirator, binding on all. Bannon v. United States, 156 U.S. 464, 15 S.Ct. 467, 39 L.Ed. 494. See also, Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461; Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; International Indemnity Co. v. Lehman, 7 Cir., 28 F.2d 1.

■■■ The various individual appellants were responsible, either for the purchasing of leaf tobacco or the sales of the manufactured products of their companies, and as such, are clearly within that class of officials responsible for the policy of the appellant companies with regard to competition. Such individual appellants are not relieved from liability for conspiracy merely because they all did not take part in the same acts. See Patterson v. United

States, 6 Cir., 222 F. 599, 632, 633. Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish guilt, as each may have been performing different tasks to bring about the desired result, or have used different methods to aid in accomplishing the common purpose. Marx v. United States, 8 Cir., 86 F.2d 245, 250; United States v. Swift, D.C.Ill., 188 F. 92, 98; United States v. MacAndrews & Forbes Co., C.C., 149 F. 823, 832, certiorari denied 212 U.S. 585, 29 S.Ct. 681, 53 L.Ed. 661. There was no error in submitting the question of the guilt of such appellants to the jury.

■ Admission of evidence with regard to the activities of the Tobacco Merchants Association, and appellants' unusually large financial contributions to it, was not erroneous. Representatives of appellants participated in the meetings of the Association, which, through its managing director maintained the most intimate business relations with officials of the companies, and was responsible for carrying on, confidentially, certain important activities to the common advantage of appellants. The only purpose for which the court admitted the evidence was to show that the appellants had an opportunity of "gathering together and communicating between each other a plan or plans alleged to constitute the conspiracy." This evidence, as well as that indicating that appellants controlled the organization, was properly admissible for the purpose of showing that the Association served as a means of communication and gave appellants an opportunity to conspire and act in combination. See Minner v. United States, 10 Cir., 57 F.2d 506; Kanner v. United States, 7 Cir., 34 F.2d 863. Through the Association, certain states were allocated to one appellant company, to assume the direction of a campaign against certain proposed state tax laws; other states were allocated to the other appellant companies. Each, in the states allocated to it, was working for the interests of all. Whether appellants availed themselves of the Association, as an instrumentality for price-fixing, was, under all the evidence, properly for the jury.

■ Error assigned on the introduction of historical testimony showing the relation of appellant companies to the old American Tobacco Company, is without merit. The court permitted such testimony for the purpose of throwing light upon the subsequent offenses, acts, and practices charged, and for no other purpose. Whether such relationship threw any light upon the offenses charged, was properly a question for the jury, and properly admissible for that purpose.

■ Nor was there error in the admission of testimony by certain expert witnesses, relating to tests given to numerous persons who were cigarette smokers, which tended to show that smokers could not tell the difference between their favorite brands of cigarettes, including appellants' brands, and others, when the identifying marks were concealed. The evidence was introduced by the Government in support of the contention that appellants did not buy different kinds of tobacco so that they might manufacture distinctive products, but only formulated their grades as one of the methods used to avoid competition in buying leaf tobacco. Inasmuch as the object of all evidence is the ascertainment of the truth with reference to the existence or non-existence of the facts in controversy, the criterion for the admissibility of evidence of experiments, is whether such evidence tends to enlighten the jury and enable it to consider more intelligently the issues presented. The admissibility of evidence of the experiment in question was peculiarly a matter within the discretion of the trial court. The weight to be given such evidence was for the jury.

■ Appellants contend that the argument of Government counsel was an inflammatory appeal to passion and prejudice, constituting reversible error. At the time of the argument, no objection was made. Each of the three groups of appellants moved for a new trial, but there was no mention of prejudicial argument in any of the motions, and the only criticism of the Government is found in the most general terms in one of the grounds relied upon on the motion for a new trial by the Liggett appellants, which was, baldly, and without particularity, stated to be: "Impropriety in the conduct of Government counsel." However, such appellants abandoned this complaint in their briefs on appeal. No objection having been made to the argument at the time; no request for appropriate corrective action having been addressed to the trial court; no complaint of prejudice arising therefrom having been set forth in motions for a new trial; and

no purpose or effect of arousing prejudice, appearing from the consideration of the argument in its entirety—we dismiss appellants' contention in this regard as without merit.

 With respect to the continuing nature of the conspiracy, the statutory period of limitations, and the requisite venue, the court charged that it was essential that it be shown by the evidence, beyond a reasonable doubt, that the offense charged, continued and existed within the period of three years immediately before the filing of the information, or during some part of that three-year period—even though it may have had its origin at some time prior thereto; and that, within the three-year period, some means, methods, or practices were employed by or under the authority of the members of the alleged combination or conspiracy, within the Eastern District of Kentucky. In order to comply with the requirement that the trial be held in the district where the crime is committed, it is sufficient that it be alleged that some of the acts, in carrying out the crime were performed in the district, and that the evidence shows this to have been the fact. Burton v. United States, 202 U.S. 344, 388, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 254, 60 S.Ct. 811, 84 L. Ed. 1129. While it is not essential to an indictment for a conspiracy to violate the Sherman Act, that the commission of an overt act in furtherance of such conspiracy, be alleged, the commission of such an act and its allegation in such an indictment, does give local venue. United States v. New York Great Atlantic & Pacific Tea Co., 5 Cir., 137 F.2d 459, 463, 464; see United States v. Trenton Potteries Co., 273 U.S. 392, 402, 403, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; United States v. Socony-Vacuum Oil Co., 7 Cir., 105 F.2d 809, 834. We find no error in the court's instruction or its refusal to give appellants' proposed instructions in this regard.

 The court did not err in declining to permit the introduction of evidence of self-serving statements to the effect that one of the appellants had rejoiced in the dissolution of the old American Tobacco Company, or in its rulings against the admissibility of evidence of praiseworthy motives and laudable conduct on the part of appellants in various matters relating to cooperation with Government marketing requests which were advantageous to the tobacco farmers in maintaining the prices paid for leaf tobacco against a falling market. See United States v. General Motors Corp., 7 Cir., 121 F.2d 376. Nor do we find error on the part of the trial court in the exclusion of evidence, in limiting the probative effect of evidence that was admitted, or in failing to give instructions in the language sought in the requests therefor.

We have considered the other various claims of error presented on the argument and in the briefs of counsel, but find that they are not meritorious.

In accordance with the foregoing, the judgment of the district court is affirmed.